# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39435**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Denis J. PAQUETTE**
Lieutenant Colonel (O-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 16 July 2019

————————————

*Military Judge:* Donald R. Eller, Jr. (arraignment); Mark W. Milam.

*Approved sentence:* Dismissal. Sentence adjudged 25 August 2017 by GCM convened at Ramstein Air Base, Germany.

*For Appellant:* Major Dustin J. Weisman, USAF; William E. Cassara, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Dayle P. Percle, USAF; Mary Ellen Payne, Esquire.

Before MAYBERRY, JOHNSON, and POSCH, *Appellate Military Judges.*

Senior Judge JOHNSON delivered the opinion of the court, in which Chief Judge MAYBERRY and Judge POSCH joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

JOHNSON, Senior Judge:

A general court-martial composed of a military judge alone convicted Appellant, in accordance with his pleas, of one specification of violating a lawful general order, one specification of fraternization, and one specification of

wrongfully endeavoring to impede an investigation, in violation of Articles 92 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892,[1] 934.[2] Contrary to Appellant's pleas, the military judge found Appellant guilty of one specification of negligent dereliction of duty on divers occasions in violation of Article 92, UCMJ.[3] The military judge sentenced Appellant to a dismissal. The convening authority approved the adjudged sentence.

Appellant raises five issues on appeal: (1) whether this court should set aside the findings and sentence due to an appearance of unlawful command influence (UCI); (2) whether the military judge's finding of guilty of negligent rather than willful dereliction of duty constituted a fatal variance; (3) whether Appellant's sentence is inappropriately severe; (4) whether Appellant was subjected to unlawful influence by the Air Force Office of Special Investigations (AFOSI)[4] and to UCI and vindictive prosecution by Appellant's chain of command;[5] and (5) whether the Special Victims' Counsel (SVC) unlawfully influenced the proceedings against Appellant.[6] In addition, although not raised as an issue by Appellant, we address a facially unreasonable delay in the post-trial processing of Appellant's case. We find no prejudicial error and we affirm the findings and sentence.

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ) and Rule for Courts-Martial are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] Appellant pleaded not guilty by exceptions to violating the lawful general order "on divers occasions." In accordance with Appellant's plea, the military judge found Appellant not guilty of the excepted "on divers occasions" language.

[3] The military judge found Appellant not guilty of the charged offense of willful dereliction of duty on divers occasions and made the finding of guilty of negligent dereliction of duty by excepting the word "willfully" and substituting the word "negligently." In addition, the military judge found Appellant not guilty of one specification of abusive sexual contact in violation of Article 120, UCMJ, 10 U.S.C. § 920.

[4] Appellant asserts he was subjected to UCI by the AFOSI; we analyze this assertion as an allegation of unlawful influence in violation of Article 37(a), 10 U.S.C. § 837(a). *See United States v. Barry*, 78 M.J. 70, 76–77 (C.A.A.F. 2018) (citation omitted).

[5] We have carefully considered Appellant's contentions that his chain of command committed UCI by "resolv[ing] to take him to court-martial regardless of the evidence . . . and regardless of the lesser dispositions available," and that his chain of command "vindictively sought to use every possible means to overcharge" him. We find these issues do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We do address in the opinion *infra* Appellant's allegation that the AFOSI unlawfully influenced the proceedings against him.

[6] Appellant personally raises issues (3) (in part), (4), and (5) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

## I. BACKGROUND

On 5 May 2016, Appellant assumed command of an expeditionary air base squadron located in a camp on a host nation air base in North Africa. At the time, Appellant was a C-17 pilot with nearly 17 years of service; this was his first squadron command. The unit was newly-established when Appellant arrived and he was its first commander. During Appellant's tenure as commander approximately 90 personnel were present at the camp, most of them Air Force members with some contractor employees. All personnel lived and worked in a very confined area of the air base which was estimated to be the size of a football field, excluding a nearby hangar and athletic track. Appellant was one of only three officers assigned to the squadron, the other two being captains at the time.

Multiple witnesses described Appellant's leadership style as relaxed, with an emphasis on personal relationships and keeping up morale in a confined and relatively austere living environment. Some members of the squadron felt Appellant's leadership style helped maintain morale and contributed to the unit's success. Others soon became concerned by Appellant's behavior, particularly with respect to two areas: his failure to impose control or accountability over alcohol use, and his relationship with a young female Airman, Airman First Class (A1C) KI.

At the time, there was in effect a lawful general order issued by Headquarters, United States Africa Command (USAFRICOM), known as General Order Number 1 (GO-1). GO-1 prescribed, *inter alia*, that United States military personnel serving in the USAFRICOM area of responsibility were generally "prohibited from consuming more than two alcoholic beverages in a 24 hour period."[7] Witnesses generally agreed Appellant imposed no system to monitor or control the amount of alcohol squadron members consumed. Furthermore, several witnesses recalled Appellant making statements to the effect that he expected individuals to be "respectful" of alcohol but that no one would be counting drinks. There was no centralized storage for alcohol, and individuals, including Appellant, stored alcohol in their work spaces and living areas. Appellant was observed personally handing alcohol to A1C KI and another Airman, and Appellant provided rum to individuals who attended non-mandatory briefings he gave on personal finances. Several witnesses described their perception

---

[7] GO-1 defined "alcoholic beverage" for purposes of the order as "a 16 ounce (500 ml) of beer, 8 ounce (250 ml) of wine, or an alcoholic beverage (mixed drink) containing 1.5 ounces of hard alcohol (45 ml)." The order provided additional prohibitions on drinking within eight hours of operating a motor vehicle or the start of regularly-scheduled duty, and on underage drinking in violation of host nation law. GO-1 additionally provided an exception to the prohibition for organized religious observances.

that alcohol use was widespread on the camp, and they were aware military personnel were violating GO-1. When the two captains and the squadron superintendent individually approached Appellant to raise their concerns about the situation, Appellant indicated he did not want to impose controls on alcohol use. At trial, Appellant admitted and pleaded guilty to violating GO-1 himself by consuming more than two drinks within a 24-hour period on one occasion.

In addition to Appellant's lax attitude toward controlling alcohol, several of the subordinate leaders within the squadron—notably the captains and several enlisted leaders—were disturbed by Appellant's unusually close relationship with A1C KI, a female security forces member who was 18 years old when she arrived at the unit. Several members of the squadron observed that Appellant and A1C KI spent an unusual amount of time together. Over time, Appellant began to give A1C KI a series of handwritten letters and encouraged A1C KI to write letters to him as well. Appellant's letters, which were subsequently obtained by investigators and entered in evidence, were quite personal in nature. The content ranged from advice about goals and relationships, to music recommendations and poetry, to statements of encouragement and affection, to admissions of sexual attraction, among other topics. The letters reflected Appellant's awareness that others within the unit would consider Appellant's relationship and communication with A1C KI inappropriate, and the need to keep the letters secret. Appellant and A1C KI referred to their clandestine letters as "weed."

Appellant's permissive attitude toward alcohol and his inappropriate relationship with A1C KI converged in a notable incident on the night of 15 July 2016. That evening, many of the unit members including Appellant and A1C KI were socializing, playing games, and drinking alcohol. A1C KI became intoxicated from drinking beer, scotch, and vodka. Appellant and A1C KI were later observed by several members of the unit sitting together in a small, open-sided vehicle known as a "mule." A1C MC (a friend of A1C KI) and two other members of the squadron observed A1C KI slumped in her seat and apparently asleep or unconscious next to Appellant, who was awake. At some point A1C KI vomited. Concerned, A1C MC carried A1C KI to her tent to sleep while another member engaged Appellant in conversation.

Appellant later referred to this incident in one of his letters:

> I don't remember saying a word to you. We just sat there [in the mule] and held hands. . . . I was not even aware enough to think this might not look good. To make matters worse (or better depending on your perspective) at one point I remember moving my hand to your leg and holding your inner thigh. Yikes! At best you were aware and comfortable with my touch. At medium you were not aware, but would have been comfortable with my touch.

> And at worst, "medium worst" plus someone found us in that situation. Our saving grace you ask? Thank god you had to throw-up. . . . Luckily [A1C MC] came and grabbed you and, to my knowledge, all my hands were in the most appropriate places.

A1C KI later had no memory of Appellant touching her inner thigh or of sitting in the mule with Appellant, other than of vomiting. There were no other witnesses to Appellant touching A1C KI's inner thigh.

In the aftermath of that incident, A1C KI's supervisors forbade her from drinking alcohol and changed her duty schedule to reduce her exposure to Appellant. Appellant expressed regret to one of the captains and to the senior security forces member in the unit, Master Sergeant (MSgt) JF, regarding the perception of himself and A1C KI from that night. Appellant also told MSgt JF he believed there was too much alcohol consumption in the camp. However, Appellant declined to sign a policy memorandum regarding enforcement of standards that the squadron superintendent had prepared. Appellant also continued secretly writing letters to A1C KI.

Eventually, concerns regarding Appellant's performance as commander reached outside the camp. On 2 August 2016, Appellant's group commander arrived at the base and informed Appellant he was under investigation. Appellant was advised he was being relieved of command and would depart for Ramstein Air Base (AB), Germany. Shortly after receiving this information, Appellant asked the squadron's additional duty first sergeant, MSgt DS, to tell A1C KI to "get rid of the weed," using the code word Appellant and A1C KI used for their letters to one another. At trial, Appellant admitted he said this in an effort to destroy evidence of his unprofessional relationship with A1C KI. MSgt DS, confused and angered by the request, refused to carry it out and reported the incident to AFOSI.

At trial, Appellant was charged with: violation of GO-1 by consuming more than two alcoholic beverages within 24 hours on divers occasions; willful dereliction of duty by failing to enforce GO-1's restrictions on alcohol consumption; abusive sexual contact against A1C KI by touching her inner thigh with the intent to gratify his sexual desires when she was incapable of consenting due to impairment; fraternization with A1C KI; and obstruction of justice for telling MSgt DS to tell A1C KI to "get rid of the weed," in violation of Articles 92, 120, and 134, UCMJ.[8] As indicated above, Appellant was convicted of violating

---

[8] One specification of fraternization with another squadron member in violation of Article 134, UCMJ, was withdrawn and dismissed after arraignment.

GO-1 on a single occasion, negligent dereliction of duty by failing to enforce GO-1, fraternization with A1C KI, and obstruction of justice.

## II. DISCUSSION

### A. Unlawful Command Influence

#### 1. Additional Background

On 8 November 2016, before Appellant's case was referred for trial, A1C KI signed a memorandum for the convening authority and other reviewing authorities regarding her desires as to the disposition of the case. Therein, A1C KI stated she was "willing to support an alternative disposition" other than court-martial, although she was also willing to testify at trial. She further stated that she "d[id] not feel that Article 15 non-judicial punishment [wa]s an appropriate disposition." On 15 November 2016, the convening authority referred Appellant's case for trial by general court-martial. On 23 November 2016, Appellant submitted a request to resign for the good of the service in lieu of being tried by a general court-martial. On 30 November 2016, A1C KI stated through her SVC at the time, Captain (Capt) JJ, that she remained willing to testify at trial but "d[id] not oppose" Appellant's offer to resign in lieu of trial. Appellant's offer to resign was ultimately denied by the Secretary of the Air Force's delegate on 10 May 2017.

At trial, the Defense moved to dismiss the charges and specifications against Appellant due to UCI. The thrust of the motion was that senior leaders within and above the Air Force had attempted and succeeded in influencing decisions by convening authorities and courts-martial with respect to allegations of sexual assault. The Defense particularly emphasized the scrutiny to which Lieutenant General (Lt Gen) Franklin was subjected for his decisions regarding the disposition of certain cases of alleged sexual assault, *see generally United States v. Boyce*, 76 M.J. 242, 244–46 (C.A.A.F. 2017); mandatory sexual assault prevention and response (SAPR) training within the Air Force; and the fact that the Prosecution had secured from the convening authority a prophylactic grant of testimonial immunity for numerous potential witnesses for Appellant's trial. The Government opposed the motion to dismiss.

The military judge denied the defense motion in an oral ruling prior to Appellant's entry of pleas. He subsequently issued a written ruling in which he analyzed two categories of UCI the Defense alleged: accusatory UCI and adjudicative UCI. *See United States v. Weasler*, 43 M.J. 15, 17–18 (C.A.A.F. 1995) (citations omitted). With respect to accusatory UCI, the military judge found, *inter alia*, the Defense presented no evidence of unlawful influence by superiors on the convening authority in Appellant's case, no evidence that the convening authority felt any pressure to refer Appellant's case to trial, and no

nexus between Lt Gen Franklin and the convening authority. The military judge further noted the officer who conducted the preliminary hearing pursuant to Article 32, UCMJ, 10 U.S.C. § 832, recommended the charges be referred to trial by general court-martial, and the convening authority took action consistent with that recommendation. Accordingly, the military judge concluded the Defense had produced "nothing more than mere allegation and speculation," and had failed to shift the burden with regard to actual or apparent accusatory UCI.

Similarly, with respect to adjudicative UCI, the military judge found only "speculation and conjecture" that Air Force SAPR training would unfairly prejudice the trier of fact against the Defense. He further found no basis to conclude the granting of testimonial immunity would create any perception in the mind of the trier of fact prejudicial to Appellant. Finally, the military judge added that Appellant's election to be tried by the judge alone rather than by court members rendered concerns about adjudicative UCI "meaningless." Accordingly, the military judge found the Defense had also failed to meet its initial burden as to adjudicative UCI.

A1C KI testified as a prosecution witness during the findings phase of Appellant's trial. On cross-examination, civilian trial defense counsel elicited A1C KI's opinion that Appellant should not be convicted of sexual assault, which drew an objection from senior trial counsel. This prompted the following exchange between the military judge and A1C KI:

> Q [Military Judge]: Do you remember writing a letter to the 3rd Air Force Commander stating that you did not, or you are not [sic] willing to support alternative disposition in this case?
>
> A [A1C KI]: Yes, sir. [sic]
>
> Q: And then you said that I do not feel that Article 15 nonjudicial punishment is appropriate disposition for this case. Do you remember saying that?
>
> A: Yes.
>
> Q: In your opinion, more stern form of punishment would be suitable for [Appellant], you remember saying that?
>
> A: Yes, sir.
>
> Q: My question is, when did you change, when did this opinion change? Because as I understand it from your testimony, even after 15 July [2016], you didn't really consider that anything wrong had happened to you?

A: Sir, Uh, Your Honor, um, so, that was drafted during, like when I was [at the deployed location], Sir, and I didn't know what exactly was going on, in my defense I didn't know like all the situations that were occurring and I thought it had been much worse than it was at the time until. . .

Q: What did you think happened?

A: Well, I, what I was told was that there were multiple, um, Charges of [Article] 120[, UCMJ].

Q: That you were the alleged victim?

A: Pardon?

Q: And that you were the person that was, that those were perpetrated upon or that there were other alleged victims?

A: There were other alleged, that's what I was informed with.

. . .

Q: Do you consider yourself a victim?

A: No, Sir.

Q: You don't? What do you consider yourself?

A: Well, according to, in writing, Sir, I am technically a victim but I don't feel victimized, Sir.

Based on A1C KI's testimony, the Defense requested the military judge reconsider his denial of the UCI motion. Civilian defense counsel reasoned that A1C KI "was given false information in order to ensure [her] cooperation in the prosecution" which "impacted whether or not this case would move forward to court-martial." After a colloquy with civilian defense counsel, the military judge denied the request, noting *inter alia* that A1C KI had supported alternative disposition but the convening authority had nevertheless elected to refer the charges for trial by general court-martial.

### 2. Law

"Allegations of unlawful command influence are reviewed de novo." *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citations omitted). "Where an assertion of unlawful command influence is litigated at trial, we review the military judge's findings of fact under a clearly-erroneous standard, but we review de novo the legal question whether those facts constitute unlawful command influence." *United States v. Ayers*, 54 M.J. 85, 95 (C.A.A.F. 2000) (citing *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A. 1994)). "On appeal, the accused bears the initial burden of raising unlawful command influence." *Salyer*, 72 M.J. at 423.

The United States Court of Appeals for the Armed Forces (CAAF) has distinguished between UCI in "the accusatorial process and the adjudicative stage, that is, the difference between preferral, forwarding, referral, and the adjudicative process, including interference with witnesses, judges, members, and counsel." *Weasler*, 43 M.J. at 17–18 (footnotes and citations omitted).

"Two types of unlawful command influence can arise in the military justice system: *actual* unlawful command influence and *the appearance of* unlawful command influence." *Boyce*, 76 M.J. at 247. Actual UCI "is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *Id.* (citations omitted). In order to demonstrate actual unlawful command influence, the appellant "must show: (1) facts, which if true, constitute unlawful command influence; (2) that the proceedings were unfair; and (3) that the unlawful command influence was the cause of the unfairness." *Salyer*, 72 M.J. at 423 (citing *United States v. Richter*, 51 M.J. 213, 224 (C.A.A.F. 1999) (quoting *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999))). "[T]he initial burden of showing potential unlawful command influence is low, but is more than mere allegation or speculation." *Id.* (citing *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002)).

> Once an issue of unlawful command influence is raised by some evidence, the burden shifts to the government to rebut an allegation of unlawful command influence by persuading the Court beyond a reasonable doubt that (1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings or sentence.

*Id.* (citing *Biagase*, 50 M.J. at 151).

Unlike actual UCI, a meritorious claim of an appearance of UCI does not require prejudice to an accused. *Boyce*, 76 M.J. at 248. "[W]hen an appellant asserts there was an appearance of unlawful command influence[,] [t]he appellant initially must show 'some evidence' that unlawful command influence occurred." *Id.* at 249 (quoting *Stoneman*, 57 M.J. at 41) (additional citation omitted). "Once an appellant presents 'some evidence' of unlawful command influence, the burden then shifts to the government to . . . prov[e] beyond a reasonable doubt that either the predicate facts proffered by the appellant do not exist, or the facts as presented do not constitute unlawful command influence." *Id.* (citing *Salyer*, 72 M.J. at 423) (additional citation omitted). If the Government fails to rebut the appellant's factual showing, it may still prevail if it proves "beyond a reasonable doubt that the unlawful command influence did not place 'an intolerable strain' upon the public's perception of the military justice system and that 'an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about

the fairness of the proceeding.'" *Id.* at 249–50 (quoting *Salyer*, 72 M.J. at 423 (quoting *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006)) (internal quotation marks omitted).

### 3. Analysis

On appeal, Appellant asserts the Defense did present "some evidence" of at least an appearance of UCI in four respects, specifically: (1) that the Secretary of the Air Force who "lost confidence" in Lt Gen Franklin remained in that office when the convening authority decided to refer Appellant's case to trial; (2) that Air Force SAPR training provided misleading information; (3) that the grant of testimonial immunity "led to the conclusion that appellant must be guilty of willful dereliction of duty where witnesses admitted to violating GO-1;" and (4) that "the government lied to A1C KI about appellant sexually assaulting multiple other women to persuade her to advise the [convening authority] that she did not support nonjudicial punishment." Appellant contends this evidence was a sufficient showing of apparent accusatory and adjudicative UCI to shift the burden to the Government, which cannot prove beyond a reasonable doubt that the appearance did not create an intolerable strain on the public's perception of the fairness of the military justice system. Accordingly, Appellant urges us to set aside and dismiss the findings with prejudice.

#### a. Waiver

As an initial matter, we address the Government's contention that Appellant's guilty plea waived his allegations of accusatory UCI. "Whether an accused has waived an issue is a question of law we review de novo." *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (citing *United States v. Rosenthal*, 62 M.J. 261, 262 (C.A.A.F. 2005)). "Whether a particular right is waivable; whether the [accused] must participate personally in the waiver; whether certain procedures are required for waiver; and whether the [accused]'s choice must be particularly informed or voluntary, all depend on the right at stake." *Id.* at 197 (quoting *United States v. Girouard*, 70 M.J. 5, 10 (C.A.A.F. 2011)). The Government concedes the CAAF has held that adjudicative UCI may not be waived. *See United States v. Baldwin*, 54 M.J. 308, 310 n.2 (C.A.A.F. 2001) ("We have never held that an issue of unlawful command influence arising during trial may be waived by a failure to object or call the matter to the trial judge's attention."). However, the Government cites *Weasler*, 43 M.J. at 18–19, for the principle that accusatory UCI may be waived. Coupling *Weasler* with "the general principle of criminal law that an 'unconditional plea of guilty waives all nonjurisdictional defects at earlier stages of the proceedings,'" *see United States v. Hardy*, 77 M.J. 438, 442 (C.A.A.F. 2018), the Government argues we should find waiver of "actual or implied accusatory UCI."

We find the Government's reasoning with respect to waiver unpersuasive for multiple reasons. First, the CAAF has not found waiver of accusatory UCI in circumstances such as the instant case, where Appellant did not affirmatively waive the issue and did not have a pretrial agreement (PTA) with the convening authority. The circumstances in *Weasler* were dramatically different; there, the defense argued at trial that the accused should be able to affirmatively waive his UCI motion in order to secure a favorable PTA from the convening authority. *Weasler*, 43 M.J. at 16. The CAAF agreed that, under those circumstances, the accused should be permitted to negotiate for his own benefit. *Id*. at 19. In contrast, in the case before us Appellant had no PTA and no perceptible incentive to waive his right to appeal the military judge's adverse ruling on the UCI motion.

Other considerations weigh against finding waiver. Although Appellant pleaded guilty to certain specifications, the military judge convicted him of one specification to which he pleaded not guilty. Moreover, regardless of Appellant's admission of guilt to certain offenses, at trial and on appeal Appellant has a colorable argument that those offenses alone would not have warranted trial by general court-martial, and therefore his guilty pleas did not moot the issue of accusatory UCI even with respect to the offenses to which he pleaded guilty. Furthermore, the Defense raised and litigated the issue at trial, fully developing the issue for appellate review. Additionally, the CAAF has long maintained that UCI "is the mortal enemy of military justice," and we appreciate the importance of remaining vigilant against it. *Boyce*, 76 M.J. at 246 (quoting *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986)) (internal quotation marks omitted).

Accordingly, under the circumstances of this case, we do not find Appellant has waived his claim of accusatory UCI. Assuming *arguendo* Appellant did waive this claim, recognizing our authority under Article 66, UCMJ, 10 U.S.C. § 866, to grant relief for legal error in spite of an appellant's waiver, and cognizant of our duty to combat UCI, we would not apply waiver in this case and would evaluate the merits of Appellant's UCI claim. *See Hardy*, 77 M.J. at 443.

### b. Accusatory UCI

Although we do not find waiver, we nevertheless agree with the military judge that the Defense has failed to present "some evidence" of accusatory UCI that impacted Appellant's case. The Defense presented no evidence that the Secretary of the Air Force or any other superior had any specific communication with the convening authority regarding the disposition of alleged sexual assaults in general or of Appellant's case in particular. Nor has the Defense presented evidence the convening authority felt inappropriate pressure from any source with respect to the disposition of Appellant's case. In fact, the convening authority acted in accordance with the advice and recommendations

lawfully provided to him by his subordinate commanders, legal advisor, and the preliminary hearing officer. Simply referring to Lt Gen Franklin or to general concerns about Air Force-wide SAPR training does not rise above the level of speculation, which is insufficient. *See Salyer*, 72 M.J. at 423.

We further find Appellant's contention that "the Government" engaged in UCI by "lying" to A1C KI fails to rise above allegation or speculation. A1C KI never identified the source of her purported belief that others had alleged sexual assault against Appellant,[9] and we find her testimony too ambiguous to conclude that anyone acting in the capacity of a representative of the Government misled her to influence her participation in the prosecution. We further note there is no indication that at any point A1C KI was unwilling to testify at trial, much less that the Government deceived her to overcome any unwillingness. Furthermore, as the military judge observed, A1C KI did support alternative disposition in writing, and in particular did not oppose Appellant's attempt to resign in lieu of trial. We therefore find Appellant has failed to meet his burden to demonstrate some evidence, rather than mere speculation, that unlawful command influence occurred.

### c. Adjudicative UCI

We are similarly unpersuaded that the Defense presented some evidence of adjudicative UCI. First, we note Appellant elected to be tried by a military judge, who is "presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citing *United States v. Mason*, 45 M.J. 483, 484 (C.A.A.F. 1997)). Moreover, the military judge who tried Appellant also adjudicated the Defense's motion to dismiss for UCI and was therefore highly attuned to Appellant's specific concerns regarding UCI. Furthermore, even if Appellant had been tried by court members, any concern that inaccurate or incomplete information from Air Force SAPR training would survive voir dire and the military judge's instructions on the law is mere speculation at best. *See United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) ("Absent evidence to the contrary, this Court may presume that members follow a military judge's instructions.") (citations omitted). With respect to Appellant's concern regarding the prophylactic grant of testimonial immunity to prosecution witnesses, we find this was a prudent measure to avoid foreseeable trial delays that would be incurred if witnesses invoked their rights during testimony. We have no concern that the military judge was unduly influenced by this measure. Even if Appellant had been tried by court members, any defense concerns regarding disclosure of this infor-

---

[9] We address *infra* Appellant's contention that A1C KI's SVC was the source of this misinformation in relation to issue (5) of his assignments of error.

mation could have been addressed by instructions to witnesses by, or in coordination with, the military judge, and if necessary by instructions to the court members themselves. Accordingly, we find Appellant has failed to present "some evidence" of actual or apparent adjudicative UCI.

## B. Variance

### 1. Additional Background

Specification 2 of Charge I alleges a violation of Article 92, UCMJ, and reads in pertinent part:

> In that [Appellant] . . . who knew or should have known of his duties . . . on divers occasions, between on or about 5 May 2016 and on or about 2 August 2016, was derelict in the performance of those duties in that he willfully failed to enforce a lawful general order, to wit: General Order No. 1, United States Africa Command, dated 18 October 2013, as it was his duty to do, by allowing subordinates under his command to consume more than two alcoholic beverages in a 24-hour period.

Trial counsel suggested during his findings argument that if the military judge was not convinced beyond a reasonable doubt that Appellant was *willfully* derelict in his duty to enforce GO-1, the military judge could still find Appellant guilty of *negligent* dereliction of duty. Civilian trial defense counsel objected on the basis that negligent dereliction of duty was not a lesser included offense (LIO) of willful dereliction of duty. The military judge noted the objection and stated he would discuss the matter with counsel later.

After the findings arguments, the military judge readdressed the issue. Civilian trial defense counsel contended that willfulness and negligence were "different" elements that required different facts to prove, and therefore negligent dereliction of duty was not a LIO of willful dereliction of duty. He further contended the Government was required to "pick a theory and stick to it," and the Defense was not on notice to defend against negligent dereliction. Senior trial counsel responded that the finder of fact can find lesser included offenses that are raised by the evidence, and that the military judge could properly find Appellant guilty of negligently committing the act alleged in the specification— i.e., "allowing subordinates under his command to consume more than two alcoholic beverages in a 24-hour period." The military judge took a short recess to research the issue, and asked the parties to do the same.

When the trial resumed, the military judge explained that he had reached the following conclusions:

> [I]t may not be a lesser included offense because it's not one. It's part of the offense itself. It's one of the elements of the offense.

> The element contemplates . . . parenthetically that it's willful or neglect or culpable inefficiency. So, there is a selection made and of course, I understand the defense's argument, you know, you prepare for – you are preparing for a case, however, this is not something that would raise or make more culpability fall on [Appellant], it actually lessens it. It lessens the maximum punishment that's involved, for the offense, if he were to be found guilty of negligence versus willful.
>
> I also, in looking at the bench book,[10] what are again, just guides that are used not necessarily the actual rules, but it does discuss, in there, at note 4, that if willful dereliction is alleged exceptions and substitutions can be used to lessen the culpability down to negligent dereliction. And then it actually guides the judge . . . to instruction 715 which -- 7–15, excuse me, or paragraph in the bench book,[11] and that has to do with variance and instructions by exceptions and substitutions. Nowhere does the bench book or that paragraph talk about it being a lesser included offense.

(Footnotes added). In response, civilian trial defense counsel announced the Defense stood by "its previous position."

The military judge found Appellant guilty of negligent dereliction of duty, excepting the word "willfully" and substituting the word "negligently" in its place.

**2. Law**

"Whether there was a fatal variance is a question of law reviewed de novo." *United States v. Treat*, 73 M.J. 331, 335 (C.A.A.F. 2014) (citations omitted). Rule for Courts-Martial 918(a)(1) "explicitly authorizes a court-martial to make findings by exceptions and substitutions." *Id*. "To prevail on a fatal variance claim, an appellant must show both that the variance was material and that he was substantially prejudiced thereby." *United States v. Marshall*, 67 M.J. 418, 420 (C.A.A.F. 2009) (citations omitted). Examples of a "material" variance include those that substantially change the nature of the offense, increase the seriousness of the offense, or increase the punishment for the offense. *Id*. (citing *United States v. Finch*, 64 M.J. 118, 121 (C.A.A.F. 2006)) (additional citation omitted). "A variance can prejudice an appellant by (1) putting 'him at risk of another prosecution for the same conduct,' (2) misleading him 'to the extent that he has been unable adequately to prepare for trial,' or (3)

---

[10] *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27–9 (10 Sep. 2014) (*Benchbook*).

[11] *Benchbook*, ¶ 7–15.

denying him 'the opportunity to defend against the charge.'" *Id.* (quoting *United States v. Teffeau*, 58 M.J. 62, 67 (C.A.A.F. 2003)).

Whether an offense is a LIO is a question of law we review de novo. *United States v. Wilkins*, 71 M.J. 410, 412 (C.A.A.F. 2012). An offense is a LIO of a charged offense if the elements of the LIO would necessarily be proven by proving the elements of the charged offense. *Id.* (citing *United States v. Alston*, 69 M.J. 214, 216 (C.A.A.F. 2010)).

### 3. Analysis

To the extent the military judge believed negligent dereliction of duty was not a LIO of willful dereliction of duty in this case, he was incorrect. *See United States v. Poynor*, No. ACM 39185, 2018 CCA LEXIS 367, at *14–18 (A.F. Ct. Crim. App. 2 May 2018) (unpub. op.), *rev. denied*, 78 M.J. 104 (C.A.A.F. 2018). The elements of willful dereliction of duty in this case included:

> (1) That Appellant had a certain prescribed duty, that is, to enforce a lawful general order, to wit: GO-1;
>
> (2) That Appellant actually knew of the assigned duty; and
>
> (3) That, at the time and place alleged, Appellant was willfully derelict in the performance of that duty, by allowing subordinates under his command to consume more than two alcoholic beverages in a 24-hour period.

*See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 16.b.(3); *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27–9 (10 Sep. 2014) (*Benchbook*), ¶ 3–16–4c. The elements of negligent dereliction of duty in this case included:

> (1) That Appellant had a certain prescribed duty, that is, to enforce a lawful general order, to wit: GO-1;
>
> (2) That Appellant knew or reasonably should have known of the assigned duty; and
>
> (3) That, at the time and place alleged, Appellant was through neglect or culpable inefficiency derelict in the performance of that duty, by allowing subordinates under his command to consume more than two alcoholic beverages in a 24-hour period.

*Id.* As we explained in *Poynor*, "it is readily apparent that to prove Appellant 'actually knew' of the assigned duty under willful dereliction would necessarily prove that he 'knew or should have known' of the duty under negligent dereliction." *Poynor*, unpub. op. at *16–17. Furthermore:

> "[N]egligence" is "an act or failure to act by a person under a duty to use due care, which demonstrates a lack of care which a

> reasonably prudent person would have used under the same or similar circumstances." Willfully failing to perform a duty necessarily demonstrates a lack of care that a reasonably prudent person would have exercised.

*Id*. at *17–18. Therefore, proving Appellant committed the greater offense of willful dereliction of duty in this case would necessarily have also proven the LIO of negligent dereliction of duty. *See Wilkins*, 71 M.J. at 412.

However, the determination that negligent dereliction of duty was a LIO of willful dereliction of duty does not complete our inquiry. The doctrines of LIOs and variance are not mutually exclusive. Indeed, the *Manual for Courts-Martial* specifically provides that a court-martial may find an accused "guilty of a lesser included offense by a process of exception and substitution." *MCM*, pt. IV, ¶ 3.b.(4). In a particular case, such exceptions and substitutions could result in a fatal variance, notwithstanding that the finder of fact intended to convict the accused of a LIO.

In the instant case, the military judge did make findings of guilty as to Specification 2 of Charge I by exceptions and substitutions. Therefore, we test those modifications to the specifications for a fatal variance by applying the criteria set forth in *Marshall*, 67 M.J. at 420. We readily conclude no such fatal variance occurred. The variance was "material" in the sense that it altered the nature of the offense from a willful dereliction of duty to a (less serious) negligent dereliction of duty, a different offense with different elements. However, we find no prejudice. The military judge simply replaced the charged word "willfully" with the substituted word "negligently;" the substance of the alleged dereliction—failing to perform his duty to enforce GO-1 by allowing subordinates to consume more than two alcoholic drinks in a 24-hour period—was exactly the same. We perceive no prospect that Appellant might be subjected to further prosecution for the same offense. Furthermore, we find no basis to conclude the Defense was misled by the change such that Appellant was unable to prepare for trial or defend against the charge. In this regard, we find it relevant not only that negligent dereliction was in fact a LIO of willful dereliction, but that the Defense never conceded negligent dereliction. On the contrary, civilian trial defense counsel contended during findings argument and during the discussion over a potential finding of negligent dereliction of duty that the

evidence showed Appellant was not criminally derelict in any respect.[12] Accordingly, we find the military judge's exception and substitution did not result in a fatal variance.

## C. Sentence Severity

### 1. Law

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ, 10 U.S.C. § 866(c). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (alteration in original) (quoting *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam)). Although we have great discretion to determine whether a sentence is appropriate, we have no authority to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

### 2. Analysis

Appellant contends his sentence to a dismissal is inappropriately severe. He contends his case was only brought to a general court-martial because of the alleged abusive sexual contact against A1C KI, of which the military judge found him not guilty. He further points to his "brilliant" career and "impeccable" service record; the expeditionary air base squadron's success in accomplishing its mission; and his willingness to plead guilty to three specifications against him. Pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), Appellant also personally asserts his chain of command failed to prepare him to command the squadron by, *inter alia*, failing to have him attend training for new squadron commanders before assuming command. Appellant requests that we set aside his dismissal and reassess his sentence.

We cannot say Appellant's sentence is unjust as a matter of law. Appellant committed four offenses for which he faced a maximum punishment that included, *inter alia*, nine years in confinement as well as a dismissal. Appellant's offenses disgraced him as an officer, sowed consternation and frustration

---

[12] In response to the military judge's conclusion that he could find negligent dereliction of duty by exception and substitution, civilian trial defense counsel stated: "[t]o be clear, the Defense's position in this case, is there was not criminal dereliction of duty regardless, under the evidence, regardless of whether it's negligence or willfulness standard because there was evidence that GO1 was enforced . . . ."

among subordinate leaders within the unit, and diminished respect for and adherence to standards within his squadron. Furthermore, the evidence shows Appellant persisted in his dereliction of duty despite being repeatedly addressed by troubled subordinates, and continued his unprofessional relationship with A1C KI despite his awareness that it was inappropriate and a matter of concern within the camp. The military judge imposed no confinement on Appellant, but determined the uniquely military punishment of a dismissal was appropriate for Appellant's uniquely military crimes. Setting aside Appellant's dismissal would be an act not of justice but of mercy, which this court has no discretion to grant. *See Nerad*, 69 M.J. at 146.

## D. AFOSI Misconduct

### 1. Additional Background

At trial, A1C KI testified regarding her memory of the night of 15 July 2016. Her last clear memory from that night was sitting on the floor of a tent, drinking a mixed drink which contained vodka and watching others play drinking games. After that point, A1C KI had an unclear memory of throwing up in the presence of her friend A1C MC. Her next memory was of waking up on her bed the next morning, wearing the same clothes and feeling "[v]ery hung over and nauseous." She did not describe any conversation or argument with A1C MC in or near her tent.

A1C MC subsequently testified, *inter alia*, that he found Appellant and A1C KI sitting in the mule together that night. Appellant was awake; A1C KI was "asleep and just almost appeared knocked out," mumbling and unresponsive when A1C MC spoke to her. A1C MC testified that he picked up A1C KI and carried her to her tent while another individual engaged Appellant in conversation. When A1C MC reached the tent he had to put A1C KI down to open the door because she was unable to stand. A1C MC then put A1C KI on her bed.

On cross-examination, A1C MC testified that the AFOSI agents who interviewed him were "rude and unprofessional." He testified the agents took his statements "out of context" and "did not want to listen to what [he] had to say." A1C MC further testified that one agent threatened to charge him with sexually assaulting A1C KI, which A1C MC denied.

### 2. Law

We review allegations of unlawful influence de novo. *United States v. Barry*, 78 M.J. 70, 77 (C.A.A.F. 2018) (citing *Salyer*, 72 M.J. at 423).

Article 37(a), UCMJ, 10 U.S.C. § 837(a), provides, *inter alia*:

> No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial

> or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

The CAAF "has long recognized that Article 37(a) prohibits unlawful influence by *all persons subject to the UCMJ.*" *Barry*, 78 M.J. at 76 (citing *United States v. Gore*, 60 M.J. 178, 178 (C.A.A.F. 2004)).

The test for unlawful influence by an individual acting without the mantle of command authority is essentially the same as the test for UCI. *Id.* at 77. "Actual unlawful influence 'occur[s] when there is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case.'" *Id.* (quoting *Boyce*, 76 M.J. at 247). To obtain relief, an appellant bears the initial burden to establish: "(1) facts, which if true, constitute unlawful influence; (2) unfairness in the court-martial proceedings (i.e., prejudice to the accused); and (3) that the unlawful influence caused that unfairness." *Id.* (citing *Boyce*, 76 M.J. at 248 (citations omitted)). Once an appellant shows "some evidence" of unlawful influence, the burden shifts to the Government to demonstrate "beyond a reasonable doubt that: (1) the predicate facts do not exist; (2) the facts do not constitute unlawful influence; or (3) the unlawful influence did not affect the findings or sentence." *Id.* (citing *Salyer*, 72 M.J. at 423 (citation omitted)).[13]

### 3. Analysis

Appellant personally contends that, in essence, the AFOSI unlawfully influenced the proceedings against him because their "intimidating and threatening posture" toward A1C MC affected his version of events that night. Appellant submitted to this court a declaration in which he asserts, *inter alia*:

> On the morning of 16 July 2016, A1C [KI] told me that [A1C MC] carried her back her [sic] to her tent the prior evening. Once there, A1C [KI] said she got up, engaged in a verbal argument with [A1C MC], and ultimately told him to "get the f*ck out of my tent."

Accepting this purported statement by A1C KI as the true version of events, Appellant contends A1C MC was pressured to make a statement and subsequently testify to a false version of events wherein A1C KI showed no signs of

---

[13] Although *Barry* addressed an allegation and finding of *actual* unlawful influence, the CAAF's explanation that Article 37, UCMJ, applies to all persons subject to the UCMJ implies the doctrine of apparent UCI applies equally to cases of *apparent* unlawful influence. *See Barry*, 78 M.J. at 76; s*ee generally Boyce*, 76 M.J. at 247–48 (explaining the distinction between actual UCI and apparent UCI).

consciousness, much less engaged in an argument with him. Appellant contends this misrepresentation lent support to the charge that he committed abusive sexual contact against A1C KI by touching her inner thigh while she was incapable of consenting. As a result, Appellant concludes, AFOSI's threat against A1C MC "fundamentally changed the course of [his] trial from the very beginning and ultimately made the Article 120 [abusive sexual contact charge] appear to be a viable charge, thereby denying my chance at a RILO [resignation in lieu of trial] and driving this case into the only venue where such charges can be heard: General Court Martial."

We recognize that Appellant's initial burden to show "some evidence" of unlawful influence is low. *See Boyce*, 76 M.J. at 247–48. Accordingly, we assume *arguendo* that A1C MC's testimony that he was threatened by AFOSI, coupled with Appellant's declaration regarding A1C KI's purported argument with A1C MC on the night of 15 July 2016, is "some evidence" of possible "improper manipulation of the military justice process." *Id.* at 247.

Nevertheless, we find Appellant has failed to demonstrate "some evidence" beyond "mere allegation or speculation" that the alleged improper manipulation by AFOSI resulted in unfairness in Appellant's court-martial proceeding. *See Salyer*, 72 M.J. at 423. Both A1C KI and A1C MC testified at Appellant's trial, under oath and subject to cross-examination. A1C KI did not testify to any such argument with A1C MC as Appellant describes; in addition, civilian trial defense counsel conspicuously failed to elicit any such testimony on cross-examination. On the contrary, A1C KI testified she had no memory of being in her tent with A1C MC. Her testimony is generally consistent with the testimony of A1C MC, who also did not describe any such argument. Moreover, although A1C MC may have felt he was treated poorly by the AFOSI, in his testimony he gave no indication that he modified his statement in response to their pressure.

Additionally, we find Appellant's theory of how the AFOSI agents' behavior affected the trajectory of his case to be highly speculative and unpersuasive. Even if A1C MC had provided a written statement and testified that he and A1C KI had an argument after he returned her to her tent, that was not the relevant moment in time for purposes of the charged abusive sexual contact. The relevant moment came earlier, when Appellant allegedly put his hand on A1C KI's inner thigh as he sat next to her in the mule. A1C MC's testimony that A1C KI was unresponsive and "almost appeared knocked out" when he found her in the mule was corroborated by the testimony of other witnesses that A1C KI appeared to be "passed out" next to Appellant in the mule, and she "was pretty out of it" and had to be carried when A1C MC took her from the mule. Taking Appellant's declaration regarding his purported conversation with A1C KI on 16 July 2016 at face value, we find little basis to conclude an

argument which occurred between A1C KI and A1C MC *after* the alleged assault by Appellant would have altered any of the recommendations or advice to the convening authority, nor the convening authority's decision to refer the case for trial.

Finally, we note the military judge ultimately found Appellant not guilty of the charged abusive sexual contact against A1C KI, indicating the alleged unlawful influence did not materially impact the adjudicative stage of the court-martial.

Accordingly, we conclude Appellant has failed to make an initial showing of actual or apparent unlawful influence that unfairly affected the proceedings.

### E. SVC Misconduct

Appellant personally asserts that A1C KI's former SVC, Capt JJ,[14] unlawfully influenced the proceedings when she "falsely told the alleged victim there were more than one sexual assault victims [sic]." Appellant refers to A1C KI's testimony, described above, that at the time she signed her 8 November 2016 memorandum stating she felt nonjudicial punishment was not an appropriate disposition, she believed there were other alleged victims of sexual assault besides herself. Appellant submitted a declaration to this court asserting that after A1C KI's testimony, the Defense was considering whether to call her back to the stand to discover who provided A1C KI this information, but A1C KI's new SVC told his trial defense counsel that the answer was covered by attorney-client privilege. As a result, Appellant contends "it is almost certain that one of her attorneys was a culprit." Appellant concludes: "[h]ad the alleged victim's attorney not engaged in this misconduct, [Appellant's] case almost certainly would not have been referred to court-martial and would have instead been disposed of by non-judicial means."

As discussed in the previous section, Article 37, UCMJ, prohibits unlawful influence by any person subject to the UCMJ. *Barry*, 78 M.J. at 76 (citing *Gore*, 60 M.J. at 178). An appellant bears the initial burden to produce "some evidence" establishing: "(1) facts which, if true, constitute unlawful influence; (2) unfairness in the court-martial proceedings (i.e., prejudice to [appellant]); and (3) that the unlawful influence caused that unfairness." *Id.* (citing *Boyce*, 76 M.J. at 248 (citations omitted)). The appellant's initial burden "is low, but is more than mere allegation or speculation." *Salyer*, 72 M.J. at 423 (citing *Stoneman*, 57 M.J. at 41).

We find Appellant's allegation of unlawful influence by the SVC fails to surpass mere speculation and therefore fails to meet his initial burden. A1C

[14] A1C KI was represented by a different SVC by the time of Appellant's trial on 21–25 August 2017.

KI did not identify the source of her belief that there were other sexual assault victims involved. According to Appellant, A1C KI's SVC indicated the answer to that question implicated attorney-client privilege, but it is speculation that Capt JJ or any other individual was the source of that information.

Nevertheless, assuming *arguendo* that Capt JJ was the source of A1C KI's belief, Appellant has failed to present more than speculation that this misinformation resulted in actual prejudice to Appellant. Appellant's assertion that "the only reason [A1C KI] wanted to proceed forward to trial was because she was falsely told that there were other alleged victims" mischaracterizes the record. A1C KI stated in her memorandum that she was willing to testify at a trial, but she also stated she would "rather not have to testify" and she was "willing to support an alternative disposition." More specifically, although A1C KI opposed nonjudicial punishment, she did not oppose Appellant's resignation in lieu of trial. Nevertheless, despite A1C KI's non-opposition, the convening authority elected to convene a general court-martial, consistent with the recommendations and advice of his subordinate commanders, staff judge advocate, and preliminary hearing officer.

Finally, we find no basis to conclude the alleged misinformation to A1C KI unfairly prejudiced Appellant at the adjudicative stage. A1C KI's testimony in response to the military judge's questions clarified the apparent misunderstanding—indeed, she testified that she did not feel like a victim. Moreover, the military judge found Appellant not guilty of the charged abusive sexual contact. Accordingly, we conclude Appellant's assignment of error is without merit.

## F. Post-Trial Delay

Although not raised as an error, we consider whether Appellant is entitled to relief for unreasonable post-trial delay. Appellant's court-martial concluded on 25 August 2017. However, the convening authority did not take action until 1 March 2018. This 188-day period exceeded by 68 days the 120-day threshold for a presumptively unreasonable delay that the CAAF established in *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Accordingly, we have considered the four factors the CAAF identified in *Moreno* to assess whether Appellant's due process right to timely post-trial and appellate review has been violated: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Id*. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *United States v. Toohey*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *Id*. (citing *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004); *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)).

In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). Where, as in this case, the appellant does not prevail on the substantive grounds of his appeal, there is no oppressive incarceration. *Id*. at 139. Similarly, where Appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *Id*. at 140.

As for anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id*. On appeal, Appellant has not asserted such anxiety or concern; however, in his clemency submission to the convening authority he asserted the post-trial delay had taken a financial and psychological toll on him. Appellant cited financial hardship caused by having his family relocate from Oklahoma to join him at Ramstein AB, Germany, including the loss of income incurred by his spouse taking a leave of absence from her job; interference with his ability to maintain his currency as a pilot; and delay in pursuing post-Air Force employment and professional opportunities. However, there is no evidence Appellant was denied the opportunity to travel after his court-martial, and he was not required to move his family to Germany; that was a decision he and his spouse made. Furthermore, although Appellant may have felt ready to undertake a civilian career, we find continued paid service in the Air Force under the circumstances of Appellant's case was not in itself cognizable prejudice under *Moreno*.

Where, as here, there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). Considering the reasons for the delay, we recognize the Government assigned the court reporter to several other matters—including the recording of three additional courts-martial and the transcription of a USAFRICOM investigation—before she completed the transcription of Appellant's case. Technical failures resulting in the loss of portions of transcription and a period of emergency leave for the court reporter also contributed to the delay. As a result, the transcript was not completed until 8 January 2018, and the military judge did not authenticate the record until 13 January 2018. However, once the record was authenticated, Appellant's case was processed with reasonable efficiency. We find the delays in Appellant's case were not due to neglect or indifference but primarily due to workload and prioritization decisions which, although less than ideal, were not of a nature to impugn the perceived fairness and integrity of the military jus-

tice system. We further note that the delay, although substantial, was not extreme, and that the record includes no specific defense demands for speedy post-trial processing. Accordingly, we find no due process violation.

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court