IN THE CASE OF


UNITED STATES, Appellee

v.

Charles E. TEFFEAU, Jr., Staff Sergeant
U.S. Marine Corps, Appellant

No. 02-0094/MC

Crim. App. Dkt. No. 99-00322

United States Court of Appeals for the Armed Forces

Argued October 15, 2002

Decided February 6, 2003

ERDMANN, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., GIERKE, EFFRON, and BAKER JJ., joined.
BAKER, J. filed a concurring opinion.

Counsel

For Appellant:  Lieutenant Thomas P. Belsky, JAGC, USNR
(argued).

For Appellee:  Lieutenant Clarice B. Julka, JAGC, USNR
(argued); Major Robert M. Fuhrer, USMC, Commander Paul W.
Jones, JAGC, USNR, and Colonel Rose Marie Favors, USMC (on
brief).

Military Judge:  R. K. Fricke and John F. Blanche

THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION

Judge ERDMANN delivered the opinion of the Court.

Appellant, Staff Sergeant (SSgt) Charles E. Teffeau, United States Marine Corps, was tried by general court-martial at Marine Corps Recruit Depot, San Diego, California. Contrary to his pleas, he was convicted by officer members of conspiring to violate a general order, failing to obey a lawful general order, dereliction of duty, making false official statements (five specifications), and obstructing justice, in violation of Articles 81, 92, 107, and 134, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 881, 892, 907, and 934 (2002). Appellant was sentenced to a dishonorable discharge, confinement for six months, and reduction to E-1. The convening authority approved the sentence as adjudged. The Navy-Marine Corps Court of Criminal Appeals affirmed the findings and only so much of the sentence as provided for a bad-conduct discharge, confinement for six months, and reduction to E-1. United States v. Teffeau, 55 M.J. 756 (N-M. Ct. Crim. App. 2001).

We granted review of the following issues:

I

WHETHER THE LOWER COURT ERRED IN APPLYING UNITED STATES V. ALLEN, 50 M.J. 84 (C.A.A.F. 1999), AND DENIED APPELLANT DUE PROCESS, IN AFFIRMING A CONVICTION BASED ON A MATERIAL VARIANCE THAT CHANGED THE ESSENCE OF THE FACTS ALLEGED AND FOUND APPELLANT GUILTY OF A SUBSTANTIVE ACT DIFFERENT FROM THAT ALLEGED IN THE SPECIFICATION?

II

> WHETHER THE LOWER COURT MISAPPLIED THE LAW, AND IN THE PROCESS CREATED A CONFLICT WITH THE ARMY COURT OF MILITARY REVIEW'S DECISION IN UNITED STATES V. JOHNSON, 39 M.J. 1033 (A.C.M.R. 1994), IN FINDING THAT APPELLANT'S STATEMENTS TO CIVILIAN POLICE OFFICERS INVESTIGATING AN AUTOMOBILE ACCIDENT WERE MADE "IN THE LINE OF DUTY" FOR PURPOSE OF ARTICLE 107, UCMJ.

III

> WHETHER THE LOWER COURT ERRED IN FAILING TO FIND THAT THIS COURT'S DECISION IN UNITED STATES V. DAVIS, 47 M.J. 484 (C.A.A.F. 1998), ESTABLISHES PARAGRAPH 31c(6)(a) OF PART IV OF THE MANUAL FOR COURTS-MARTIAL AS A VIABLE DEFENSE TO THE OFFENSE OF FALSE OFFICIAL STATEMENT.

At the argument of this case, the parties agreed that our decision in United States v. Czeschin, 56 M.J. 346 (C.A.A.F. 2002) was dispositive of Issue III, and that issue is therefore answered in the negative.

FACTS

At all times pertinent to the offenses in this case, Appellant was a recruiter for the United States Marine Corps. Appellant and SSgt James Finch were both assigned recruiting duties at the Marine Corps recruiting substation in Wichita, Kansas. The duties of a Marine recruiter included making weekly contact with recruits awaiting entry on active duty under the Delayed Entry Program (DEP). Ms. Jennifer Keely and Ms. Jennifer Toner were two such recruits. They enlisted in the

3

United States Marine Corps and both women had SSgt Finch as a recruiter at some point in their respective enlistment processes. On January 3, 1997, the women were members of the United States Marine Corps, enlisted in the DEP, and awaiting active duty.

On January 2, 1997, the two female recruits contacted Appellant and SSgt Finch. Plans were made for the four of them to meet the following day at 11:00 a.m. at Ms. Toner's home. The purpose of this gathering was to celebrate Ms. Keely's impending departure for Marine Corps boot camp.

On the morning of January 3, Appellant advised his supervisor, Gunnery Sergeant (GySgt) Terrence Quilty, that he and SSgt Finch were proceeding to the nearby town of Winfield, Kansas. Gunnery Sergeant Quilty did not know specifically who the two recruiters were visiting, but he did not give Appellant permission to go to Ms. Toner's house or authorize him to drink alcohol with either of the DEP recruits.

Appellant and SSgt Finch drove to Winfield in uniform and in a government vehicle. At approximately 10:55 a.m., the two recruiters stopped at a gas station. Staff Sergeant Finch purchased a case of beer with a $50 dollar bill and Appellant carried the beer to the government vehicle. The recruiters then drove the remaining distance to Ms. Toner's house.

Ms. Keely arrived at the Toner home after appellant and SSgt Finch. Appellant and SSgt Finch, while still in uniform, each drank a quantity of Jack Daniels whiskey. Ms. Keely drank schnapps that was in the freezer. The drinking continued for almost three hours. Ms. Toner did not drink because she had the flu and because she had to work later that afternoon. When Ms. Toner requested that they move the party because she had to go to work, the two recruiters changed out of their uniforms and departed with Ms. Keely for Winfield Lake to continue the celebration. Appellant drove the government vehicle to the lake, following SSgt Finch and Ms. Keely, who were in Ms. Keely's red Ford Mustang.

Upon returning from Winfield Lake, SSgt Finch and Ms. Keely were involved in a single car accident. Ms. Keely's red Mustang skidded 243 feet and hit a tree. Ms. Keely was killed and SSgt Finch was injured. Ms. Keely's blood-alcohol content (BAC) was determined to be .07; SSgt Finch had a BAC of .14. An empty Budweiser Light beer can was recovered from Ms. Keely's car. The beer can had the same lot number as beer cans found at the lake and beer sold at the gas station where Appellant and SSgt Finch bought beer. During a subsequent search of the government vehicle, no beer or beer cans were found.

ISSUE I

Background

Charge II alleged a violation of Article 92, failure to obey a lawful general order.  In pertinent part, the specification upon which appellant was arraigned read as follows:  "did . . . fail to obey a lawful general order, to wit: paragraph 6d, of Marine Corps Recruit Depot, San Diego, Order 1100.4a, dated 21 May 1992 by wrongfully providing alcohol to Jennifer Keely, a person enrolled in the delayed entry program."[1]

---

[1] Paragraph 6 of Marine Corps Recruit Depot, San Diego, Order 1100.4a (21 May 1992), reads as follows:

> 6.  Action.  Recruiting personnel are forbidden to engage in, encourage, solicit, or otherwise seek nonprofessional personal relationships with members of the DEP [Delayed Entry Program] or other prospective recruit applicants.  The following conduct is specifically prohibited:
>
> a.  Encouraging, seeking, soliciting, or engaging in any sexual relations with members of the DEP or other prospective recruit applicants.  This is intended to include overt sexual acts as well as using rank or supervisory position to take advantage of a prospective recruit or member of the DEP for personal sexual gratification, regardless of the knowledge or consent of the individual involved.
>
> b.  Financial dealings of any kind with any member of the DEP or prospective recruit applicant, to include acceptance of services or other gratuities, borrowing or lending money, or commercial solicitation.  This does not preclude acceptance of those personal gifts approved by reference (b).
>
> c.  Engaging in physical contact with or touching any member of the DEP or prospective recruit applicant other than reasonable physical contact necessary to protect life or prevent serious injury, in self-defense, or as a necessary part of admin activities.
>
> d.  Providing alcoholic beverages, either directly or through the use of a third party, for consumption, to any member of the DEP or prospective recruit applicants under any circumstances, unless previously approved by the applicable District CO.

Concerning this offense, the members were instructed as follows:

In the specification of Charge II, the accused is charged with the offense of violating a lawful general order. In order to find the accused guilty of this offense, you must be convinced by legal and competent evidence beyond a reasonable doubt: number one, that there was in existence a certain lawful general order in the following terms, that is, Paragraph 6d, of the Marine Corps Recruit Depot, San Diego, Order 1100.4a, dated 21 May 1992 which provides in part that recruiting personnel are forbidden to engage in, encourage, solicit, or otherwise seek nonprofessional relationships with members of the DEP or other prospective recruit applicants. The following conduct is specifically prohibited: Providing alcoholic beverages, either directly or through the use of a third party, for consumption, to any member of the DEP or prospective recruit applicants under any circumstances, unless previously approved by the applicable District Commanding Officer.

Two, that the accused had a duty to obey such order; and three, that on or about the 3rd of January 1997 at Winfield, Kansas, the accused failed to obey this lawful general order by wrongfully providing alcohol to Jennifer Keely, a person enrolled in the delayed entry program.

Concerning variance or exceptions and substitutions, the military judge instructed as follows:

If you have doubt about the time, place, or manner in which any of the offenses allegedly occurred, but you are satisfied beyond a reasonable doubt that the offense or offenses were committed at a time, place, or in a particular manner which differs slightly from the exact time, place, or manner alleged in the specification, you may make minor modifications in reaching your findings by changing the time, place, or manner in which the alleged offenses described in the specification occurred, provided that you do not change the nature or identity of the offense.

Further direction was given with respect to using the findings worksheet to annotate findings by exceptions and substitutions:

> . . . Should the members find that some of that language in the specification doesn't apply or has not been proved by – beyond a reasonable doubt, you can use part three in excepting certain language out of the specification. Now when you do that you don't necessarily have to substitute anything in its place either. You just – you just can delete that language you think has not been proven beyond a reasonable doubt from the specification.

There were no objections to the instructions as given nor was there a request for any additional instructions.

Findings were announced with respect to Charge II as follows:

> PRES: Of the Specification of Charge II: Guilty, except for the words paragraph 6[d] of Marine Corps Recruit Depot Order 1100.4a. Specifically, "wrongfully providing alcohol to Jennifer Keely." Substituting therefore the words – I don't have the note page with me – excuse me, sir. That was it, yes – "wrongfully and engaging in and seeking in a nonprofessional, personal relationship with Jennifer Keely, a person enrolled in the Delayed-Entry Program."
>
> MJ: Of the excepted words: Not guilty. Of the substituted words: Guilty?
>
> PRES: And the substituted words would be paragraph 6 of Marine Corps Recruit Depot, San Diego, 1100.4a, dated 21 May 92,' "by wrongfully engaging in and encouraging and otherwise seeking a nonprofessional, personal relationship with Jennifer Keely, a person enrolled in the Delayed-Entry Program." It's the substituted words.
>
> MJ: All right. Of the excepted words: Not guilty. Of the substituted words: Guilty.

8

     PRES:     Guilty.  That's correct.

     MJ:  Okay.  Of  Charge II?

     PRES:     Of  Charge II:  Guilty.

In sum, the members found Appellant guilty of a violation of paragraph 6 for engaging in or seeking a nonprofessional personal relationship.  The findings by exceptions and substitutions eliminated the specificity of subparagraph "d," providing alcohol, and acquitted Appellant of that particular alleged conduct.

Before the Court of Criminal Appeals Appellant argued that these findings by exceptions and substitutions amounted to a material variance requiring that the offense be dismissed.  The government responded that "the members were certainly convinced that [A]ppellant violated the Order [against engaging in, encouraging or otherwise seeking nonprofessional personal relationships with members of the DEP or other prospective recruits] by consuming alcohol with Jennifer Keely and Jennifer Toner, both members of the DEP."  The court below agreed with Appellant that there was a material variance, noting that the Government sought "to anchor the guilty findings on a related, but materially different, incident than the one originally charged in the specification."  Teffeau, 55 M.J. at 762.  The Court of Criminal Appeals denied relief, however, finding that appellant had not demonstrated substantial prejudice as required

United States v. Teffeau, No. 02-0094/MC

by our decision in United States v. Allen, 50 M.J. 84, 86
(C.A.A.F. 1999).  Id.


                          Discussion

     "A variance between pleadings and proof exists when
evidence at trial establishes the commission of a criminal
offense by the accused, but the proof does not conform strictly
with the offense alleged in the charge."  Allen, 50 M.J. at 86
(citing United States v. Lee, 1 M.J. 15, 16 (C.M.A. 1975)).  The
Manual for Courts-Martial, United States (2002 ed.) [hereinafter
MCM] anticipates the potential for a variance by authorizing
findings by exceptions and substitutions.  See Rule for Courts-
Martial (RCM) 918(a)(1).  Findings by "[e]xceptions and
substitutions may not be used to substantially change the nature
of the offense or to increase the seriousness of the offense or
the maximum punishment for it."  Id.; United States v. Wray, 17
M.J. 375, 376 (C.M.A. 1984)(the same prohibition existed in
Manual for Courts-Martial, United States (1969 Rev. ed.) para.
74(b)(2)).

     Minor variances, such as the location of the offense or the
date upon which an offense is allegedly committed, do not
necessarily change the nature of the offense and in turn are not
necessarily fatal.  See, e.g., United States v. Hunt, 37 M.J.
344, 347-48 (C.M.A. 1993)(date of rape charged as "on or

                              10

about"); United States v. Parker, 54 M.J. 700, 711 (A. Ct. Crim. App. 2001)(change in the date of an alleged rape not material); United States v. Willis, 50 M.J. 841 (A. Ct. Crim. App. 1999) (change in language alleged to be false under Article 107 violation not material).  Where, however, an appellant can demonstrate that a variance is material and that he or she was prejudiced, the variance is fatal and the findings thereon can not stand.

For whatever reason, the members rejected the inferential evidence and trial counsel's argument that alcohol was provided to Ms. Keely.  The government counsel's argument before the Court of Criminal Appeals sought to base the finding on conduct at Ms. Toner's home where Appellant and SSgt Finch did not provide the alcohol.  Based on the Government's argument and the record of trial, the Court of Criminal Appeals found that the findings by exceptions and substitutions reflected a "different incident" than that which was charged.

Because we conclude that this is a finding of fact in this case, and the finding is not clearly erroneous, we accept as binding upon this Court that the finding by exceptions and substitutions reflected a different incident.  See United States v. Tollinchi, 54 M.J. 80, 82 (C.A.A.F. 2000)(Court of Appeals for the Armed Forces will not overturn findings of fact by a Court of Criminal Appeals unless they are clearly erroneous or

11

unsupported by the record).  We also agree with the lower court's conclusion of law that this variance was material.  See Hunt, 37 M.J. at 347 (holding that there was no material variance "as a matter of law").  The findings by exceptions and substitutions convicted Appellant of a different offense, involving a different incident than that described in the specification upon which Appellant was arraigned.  This was a "substantial" change in violation of R.C.M. 918(a)(1).

We disagree, however, that there is no prejudice in this case.  Prejudice can arise from a material variance in a number of ways.[2]  An appellant may show that the variance puts him at risk of another prosecution for the same conduct.  Lee, 1 M.J. at 16.  An appellant may show that his due process protections have been violated where he was "misled to the extent that he has been unable adequately to prepare for trial," Lee, 1 M.J. at 16, or where the variance at issue changes the nature or identity of the offense and he has been denied the opportunity to defend against the charge.  Wray, 17 M.J. at 376.  It is this latter form of prejudice, a violation of due process, that appellant suffered.

---

[2] To the extent that our opinion in United States v. Allen, 50 M.J. 84 (C.A.A.F. 1999) could be read to require that an appellant must show both that he or she was misled and that the variance put the appellant at risk of another prosecution, we take this opportunity to make it clear that a dual showing is not required and that these are alternative forms of demonstrating error.

Fundamental due process demands that an accused be afforded the opportunity to defend against a charge before a conviction on the basis of that charge can be sustained. "Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused." Dunn v. United States, 442 U.S. 100, 106-07 (1979). Applying this principle, we have held that a conviction for a larceny that was not charged violates due process. Wray, 17 M.J. at 376.

We believe a similar result is required in Appellant's case where his conviction is predicated upon a different incident than the one originally alleged in the specification. By virtue of exercising its prosecutorial discretion in the charging decision, the Government alerted Appellant that he was to defend against a claim that he "provided" alcohol to Ms. Keely in violation of the lawful general order. Appellant's defense strategy highlighted that he did not provide the alcohol consumed at the Toner home, that he did not arrive at the lake until after the accident, and that he could not be linked beyond a reasonable doubt to beer cans found in Ms. Keely's Mustang. The findings by exceptions and substitutions acquitted the Appellant of the specific offense of "providing" alcohol to Ms. Keely and substituted a broader offense that Appellant had not been provided the opportunity to defend against.

The Court of Criminal Appeals did not err in applying the two-prong test enunciated in Allen. That court did err, however, when it failed to recognize the prejudice flowing from a material variance that changes the very nature of the offense in issue and impacts upon an accused's ability to defend against the charge against him. When a material variance deprives an accused of the fundamental right to due process, he has been prejudiced.

The findings of guilty of Charge II and its specification must be set aside.

## ISSUE II

### Background

Due to the fatality and the alcohol-involvement, Winfield police officers conducted an extensive investigation into the circumstances surrounding the accident. The civilian officers were aware of Appellant's military status at the time they interviewed him. The Commanding Officer of the 8th Marine Corps District directed a command investigation into the accident as well. Appellant made several false statements concerning the circumstances surrounding the accident as the police and command investigators attempted to determine what occurred.

In three specifications, Appellant was found guilty of making false official statements in violation of Article 107 to

Winfield police officers.  (Charge III, specifications 1, 2, and 5.)  Prior to pleas, Appellant moved to dismiss these specifications for failure to state an offense.  The motion alleged both that the statements were not official within the meaning of Article 107 because Appellant did not have an independent duty or obligation to speak.

In addition to the facial information in the specifications, the Government presented evidence relating to appellant's duty status at the time of the incident and statements.  Specifically, the Government noted that Appellant served as a canvassing recruiter; the evening after the accident, Appellant was in uniform when the Winfield police questioned him; the first time Appellant was interviewed by the Winfield police, Appellant was accompanied to the police department by his military supervisor, GySgt Quilty; and Appellant was not given any direction or order to speak to the police.

The military judge made findings of fact and conclusions of law.  His findings of fact included:

> [T]hat at the time that these purported false statements were made, the accused was an active duty service member. . . [and that] the contents of these purported statements to the Winfield City Police Department directly pertained to the accused's performance of his military duties as a canvassing recruiter assigned to the Winfield, Kansas area.

The military judge's conclusions of law were:

15

Number one, the accused statements were made in the line of duty because they directly related in the performance of his military duties as a Marine recruiter assigned to the local area wherein the alleged offenses took place.

Two, the Court specifically adopts the legal analysis set forth in the trial counsels' brief regarding breath [sic] of the term "official" as used in Article 107 of the UCMJ. That it is the use of the word "official" is the substantial equivalent to the phrase, quote, in any manner [sic] within the jurisdiction of any department or agency of the United States as found in 18 United States Code, Section 1001, unquote.

Four [sic], based on the foregoing analysis, the Court concludes that all statements which the accused provided to various members of the Winfield Police Department would fall within the legal definition of an official statement as mandated by Article 107 of the UCMJ; notwithstanding the status of the recipients as private nonmilitary parties and the fact that these statements were in an oral vice written form.

The military judge denied the motion to dismiss the allegations of false official statements made to civilian officers of the Winfield police.

Discussion

Article 107 punishes "[a]ny person subject to this chapter, who, with intent to deceive, . . . makes any other false official statement knowing it to be false[.]" A statement is "official" if that statement is "made in the line of duty." MCM Part IV, para. 31 c (1). This definition of "official" does not mean that the President intended to limit "line of duty" in this

context to the meaning those words may have in other, non-criminal contexts.[3]

In fact, this Court has recognized that the scope of Article 107 is more expansive than its civilian counterpart, 18 U.S.C. § 1001 (2002), because "[t]he primary purpose of military criminal law – to maintain morale, good order, and discipline – has no parallel in civilian criminal law." United States v. Solis, 46 M.J. 31, 34 (C.A.A.F. 1997). See also United States v. Smith, 44 M.J. 369, 372 (C.A.A.F. 1996)(referencing Article 107's "unique language"); United States v. Hagee, 37 M.J. 484, 485 (C.M.A. 1993)("Nothing in the plain language of this statute limits its scope to deceptions in which the United States is the intended or actual direct victim.").

Examining Appellant's conduct in light of the language and purposes of Article 107, we find that Appellant's statements to civilian officers of the Winfield police were official. It is clear that, from the inception of the arrangement to meet the two women through and including Appellant's statements to both military and civilian officials, this entire incident and investigation bore a direct relationship to Appellant's duties and status as a Marine Corps recruiter.

---

[3] For example, "line of duty" determinations made to determine a servicemember's entitlement to medical care at government expense, to determine entitlement to disability compensation at a physical evaluation board, or to determine Government liability under the Federal Tort Claims Act, 28 U.S.C. § 2671-72 (2002).

Appellant knew Staff Sergeant Finch and both women as a result of his official duties.  Appellant reported to his supervisor that he was meeting with someone in Winfield on January 3, implying to GySgt Quilty that the meeting was related to Appellant's recruiting duties.  Both the women were newly recruited into the Marine Corps DEP, and both had used SSgt Finch as a recruiter.  Appellant and SSgt Finch used an official government vehicle when they went to meet the women.  Appellant and SSgt Finch were in uniform when they went to meet the women.  Unquestionably, the entire sequence of events had its origin in Appellant's duties, responsibilities, and status as a recruiter.

The Winfield police were aware of Appellant's duties and status.  A military supervisor accompanied Appellant to the Winfield Police Department the night of the accident.  Appellant was in uniform when interviewed by the Winfield police officers.

The investigation concerned potential criminal misconduct involving a person or persons subject to the UCMJ.  There was a parallel military investigation into this incident.  The subject matter of the Winfield police investigation was of interest to the military and within the jurisdiction of the courts-martial system.  See Solorio v. United States, 483 U.S. 435 (1987). Appellant's conduct and his subsequent statements about his conduct could have, and did, subject him to criminal liability

in the military justice system for various offenses in addition to his false official statements.

We reject any absolute rule that statements to civilian law enforcement officials can never be official within the meaning of Article 107.  See, e.g., United States v. Johnson, 39 M.J. 1033 (A.C.M.R. 1994).  Any such construction of Article 107 is unreasonably restrictive in light of the unique purposes of Article 107 and the military criminal law.  The circumstances leading up to and surrounding the statements made to the Winfield police bear a clear and direct relationship to Appellant's duties as a recruiter and reflect a substantial military interest in the investigation.  The statements Appellant made to the Winfield police officers were therefore "official" within the meaning of Article 107.

## Decision

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed.  The findings of guilty of Charge II, its specification and the sentence are set aside, and Charge II and its specification are dismissed.  The case is returned to the Judge Advocate General of the Navy for remand to the Court of Criminal Appeals.  That court may reassess the sentence or order a sentence rehearing.

BAKER, Judge (concurring):

In United States v. Wray, 17 M.J. 375 (C.M.A. 1984), members convicted the appellant by exceptions and substitutions changing both the date and the amount of the larceny.  The Court concluded that this changed the identity of the offense.  Therefore, the Court was not prepared to "uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial . . . ."  Id. at 376.  The Court dismissed the charge and its specification "without prejudice to another trial being held on the proper charge."  Id.

In this case, the Court dismisses Charge II and its specification because through the members' exceptions and substitutions, "Appellant's conviction is predicated upon a different incident than the one originally alleged in the specification."  _ M.J. (10).  However, the Court does not expressly state, as in Wray, that another trial may be held on "a" or "the" proper charge, or alternatively distinguish the outcome in Wray from this case so as to preclude retrial on a proper charge.

In my view, this silence should not be interpreted as overruling the result in Wray or the general proposition on which it is based.  Reversal of a conviction does not prevent retrial for the same offense unless the reversal is

United States v. Teffeau, No. 02-0094/MC

based on insufficiency of the evidence.  Montana v. Hall,
481 U.S. 400, 402-03 (1987)(per curiam); United States v.
Ball, 163 U.S. 662, 672 (1896).[*]

---

[*] The Supreme Court in Montana v. Hall, 481 U.S. 400, 402-03
(1987)(per curiam), stated:

> It is a "venerable principl[e] of double jeopardy
> jurisprudence" that "the successful appeal of a
> judgment of conviction, on any ground other than the
> insufficiency of the evidence to support the verdict,
> Burks v. United States, 437 U.S. 1 (1978), poses no
> bar to further prosecution on the same charge."
> United States v. Scott, 437 U.S. 82, 90-91 (1978).
> See generally 3 W. LaFave & J. Israel, Criminal
> Procedure § 24.4 (1984). Justice Harlan explained the
> basis for this rule:

>> "Corresponding to the right of an accused to be
>> given a fair trial is the societal interest in
>> punishing one whose guilt is clear after he has
>> obtained such a trial. It would be a high price
>> indeed for society to pay were every accused
>> granted immunity from punishment because of any
>> defect sufficient to constitute reversible
>> error in the proceedings leading to conviction.
>> From the standpoint of a defendant, it is at
>> least doubtful that appellate courts would be
>> as zealous as they now are in protecting
>> against the effects of improprieties at the
>> trial or pretrial stage if they knew that
>> reversal of a conviction would put the accused
>> irrevocably beyond the reach of further
>> prosecution. In reality, therefore, the
>> practice of retrial serves defendants' rights
>> as well as society's interest." United States
>> v. Tateo, 377 U.S. 463, 466 (1964).

> See Burks v. United States, supra, at 15.