*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
MONAHAN, STEPHENS, and DEERWESTER
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Israel EDMONDS**
Corporal (E-4), U.S. Marine Corps
*Appellant*

**No. 201900325**

Decided: 29 March 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Jeffrey Munoz

Sentence adjudged 29 March 2019 by a general court-martial convened at Marine Corps Base Camp Pendleton, California, consisting of officer and enlisted members. Sentence approved by the convening authority: confinement for 2 years and a dishonorable discharge.

For Appellant:
*Lieutenant Commander Christopher K. Riedel, JAGC, USN* (argued)
*Bethany L. Payton-O'Brien, Esq.* (on brief)

For Appellee:
*Major Kerry E. Friedewald, USMC* (argued)
*Lieutenant Gabriel K. Bradley, JAGC, USN* (on brief)
*Lieutenant John L. Flynn, JAGC, USN* (on brief)
*Major Clayton L. Wiggins, USMC* (on brief)

Senior Judge STEPHENS delivered the opinion of the Court, in which Chief Judge MONAHAN and Judge DEERWESTER joined.

_____

**PUBLISHED OPINION OF THE COURT**

_____

STEPHENS, Senior Judge:

Appellant was convicted contrary to his pleas of one specification of sexual assault in violation of Article 120,[1] Uniform Code of Military Justice [UCMJ]. He now appeals, alleging seven Assignments of Error [AOEs], which we have renumbered: (1) that the military judge erred in giving a variance instruction; (2) that the evidence was legally and factually insufficient; (3) that Appellant's detailed trial defense counsel [TDC] had a conflict of interest; (4) that the trial counsel [TC] committed prosecutorial misconduct; (5) that the cumulative effects of the errors undermined the fairness of the court-martial; (6) that there was prejudicial post-trial delay; and (7) that it was error for the military judge to admit Appellant's uncorroborated statements into evidence.[2]

We find prejudicial legal error in the first and second AOEs. We find the variance reflected in the members' findings was material and prejudicial, warranting dismissal with prejudice. But we also separately find that the evidence is legally insufficient under *United States v. Sager*,[3] also warranting dismissal with prejudice. Concerning the third AOE, after ordering and considering an affidavit from the detailed TDC, we do not find a conflict of interest.[4] Due to our resolution of the above AOEs, we find the fourth and fifth AOEs moot. We take action in our decretal paragraph.

---

[1] 10 U.S.C. § 920.

[2] Appellant's sixth and seventh AOEs are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We have reviewed these AOEs and find them to be without merit. *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987), cert. denied, 485 U.S. 968 (1988).

[3] 76 M.J. 158 (C.A.A.F. 2017).

[4] We review AOE III for reasons of judicial economy.

## I. BACKGROUND

Appellant lived on Marine Corps Base Camp Pendleton, California. He and his Marine wife had no children and their on-base home was the site of frequent alcohol-fueled parties. Appellant was sexually attracted to both men and women, but his wife apparently did not know that. She eventually learned that during one of these parties Appellant had some kind of sexual encounter with another male Marine who was Appellant's close friend. Appellant's wife confronted him about his extra-marital sexual activities. Soon after that came to light, the friend, Corporal [Cpl] "Lima,"[5] formally alleged that Appellant had sexually assaulted him.

Prior to trial, Appellant was interviewed by the Naval Criminal Investigative Service [NCIS]. In his interview, he indicated he had a sexual encounter with Cpl Lima sometime in the summer or fall of 2014. However, when Cpl Lima reported the sexual assault to NCIS, he stated the incident happened in October 2015 at a pre-deployment party.

The incident was essentially that Cpl Lima came to Appellant's house to a party, drank alcohol to the point of intoxication, and fell asleep on Appellant's couch. When he awoke the next morning, his pants were unbuttoned and unzipped. Appellant, also very intoxicated, contends that he performed oral sex on Cpl Lima, but was unable to see his eyes and did not know for certain whether he was asleep or not. Appellant also contends that a few days afterwards, he and Cpl Lima discussed what happened, and Cpl Lima laughed the incident off and was not upset. However, Cpl Lima testified that he recalled waking up on the couch with his pants undone and asking his girlfriend—who attended the party with him—if they had engaged in any sexual activity. She told him they did not. About 14 months later, when Cpl Lima was deployed to Kuwait, he got a very tearful and upset video call from Appellant's wife. She told him she had recently confronted her husband about rumors of his sexual activity with Cpl Lima while he was asleep. About two months after that call, Cpl Lima returned to Camp Pendleton and filed an unrestricted report of sexual assault.

The Government charged Appellant with three specifications of sexual assault under Article 120 for the single incident. The Government's three theories were that Appellant had (1) committed a sexual act on Cpl Lima when he was unaware the sexual act was occurring due to his "exhaustion

---

[5] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

and intoxication" [Specification 1]; (2) that he committed a sexual act on Cpl Lima when he was asleep [Specification 2]; and (3) that he performed a sexual act on Cpl Lima when he was incapable of consenting due to his intoxication [Specification 3]. Appellant was acquitted of Specifications 2 and 3, but was convicted of Specification 1.

All of these specifications were charged as occurring "between on or about October 2015 and on or about November 2015." After Appellant testified in front of the members that the incident [which he described as consensual] occurred in late September or early October of 2014, the Government moved, over Defense objection, for a variance instruction that would allow the members in their findings to expand the dates of the alleged crime. The military judge granted the motion. The members convicted Appellant on Specification 1 of committing a sexual act on Cpl Lima when he was unaware the sexual act was occurring due to his "exhaustion and intoxication" and, by exceptions and substitutions, that this act happened between on or about "July 2014 and on or about October 2015."

In addition, during the trial, Appellant's detailed TDC temporarily lived with the Victims Legal Counsel [VLC] who represented Cpl Lima. The detailed TDC did not discuss this temporary living arrangement with Appellant until the eve of trial, and only did so after Appellant's civilian TDC learned of the arrangement and informed Appellant. Because the detailed TDC was responsible for large portions of Appellant's defense, if Appellant had wanted to dismiss his detailed TDC, it would have required a lengthy continuance. Detailed TDC then discussed the issue with Appellant, who signed a document acquiescing to the situation. On appeal, Appellant argues this was a conflict of interest and that he only signed the document due to his lack of complete understanding of the issue. In response, this Court ordered the Government to obtain an affidavit from Appellant's detailed TDC.

## II. DISCUSSION

### A. The Variance Was Fatal

*1. Standard of Review and the Law*

Whether a variance is fatal is a question of law this court reviews de novo.[6] Rule for Courts-Martial [R.C.M.] 918 authorizes a court-martial to make

---

[6] *United States v. Treat*, 73 M.J. 331, 335 (C.A.A.F. 2014).

findings by exceptions and substitutions.[7] The Discussion states, "Changing the date or place of the offense may, but does not necessarily, change the nature or identity of the offense."[8] When a variance is made to the charge sheet, it must not offend the Constitutional due process right of an accused to "receive fair notice of what he is being charged with."[9] For a variance to be fatal to a specification, it must be both material and substantially prejudicial.[10] A variance is material when it "substantially changes the nature of the offense, increases the seriousness of the offense, or increases the punishment of the offense."[11] "A variance can prejudice an appellant by (1) putting him at risk of another prosecution for the same conduct, (2) misleading him to the extent that he has been inadequately able to prepare for trial, or (3) denying him the ability to defend against the charge."[12] In determining whether a material variance denied an accused the opportunity to defend against a charge, we "consider how the defense channeled its efforts and what defense counsel focused on or highlighted."[13]

### 2. The 2014 Party as an Alternate Date for the Alleged Sexual Assault

The Government had very early notice this incident may have occurred in 2014. In Appellant's interview with NCIS, he admitted that a sexual act occurred with Cpl Lima at his house in October of 2014. This interview was about 11 months before preferral of charges and almost 17 months before arraignment.

At an Article 39(a) session held one month before the start of the contested phase of the trial, the parties litigated whether some of Appellant's admis-

---

[7] R.C.M. 918(a).

[8] R.C.M. 918(a) Discussion.

[9] *Treat*, 73 M.J. at 335 (citing and quoting *United States v. Girouard*, 70 M.J. 5, 10 (C.A.A.F. 2011).

[10] *United States v. Marshall*, 67 M.J. 418, 420 (C.A.A.F. 2009) (citing *United States v. Finch*, 64 M.J. 118, 121 (C.A.A.F. 2006)); *United States v. Hunt*, 37 M.J. 344, 347 (C.M.A. 1993) (citing *United States v. Lee*, 1 M.J. 15, 16 (C.M.A. 1975)).

[11] *Marshall*, 67 M.J. at 420. (quoting *Finch*, 64 M.J. at 121 (citing *United States v. Teffeau*, 58 M.J. 62, 66 (C.A.A.F. 2003))) (internal quotation marks omitted).

[12] *Treat*, 75 M.J at 336 (citing *Marshall*, 67 M.J. at 420 (quoting *Teffeau*, 58 M.J. at 67)) (internal quotations marks omitted).

[13] *Id.* (citing *Marshall*, 67 M.J. at 421; *Teffeau*, 58 M.J. at 67; *United States v. Lovett*, 59 M.J. 230, 236 (C.A.A.F. 2004)).

sions to NCIS could be corroborated. During this session, they discussed the date of the party. The military judge said, "There appears to be a little bit of confusion as to when this thing happened with [Cpl Lima]. So, for example, the accused seems to give a different timeframe than what is charged."[14] The TC responded, "The accused states that it happened in the previous year, around August of 2014 in his interrogation."[15] But then the TC informed the military judge that Cpl Lima mentioned a "pre-deployment party" and added "we have records of when the Marine deployed. It was mid-October of 2015. That is why it is charged the way it is, sir."[16]

Later the defense counsel argued that Appellant's statements were not corroborated because "[t]his party, where this alleged sexual assault occurred, did not happen in 2015. It happened in 2014."[17] He specifically pointed to a witness, Sergeant [Sgt] Bravo who told NCIS of the 2014 date. Sgt Bravo stated, "He [Cpl Lima] told me in late 2014 that [Appellant] had performed oral sex on him."[18] Sgt Bravo made his statement to NCIS nearly a year and a half before preferral. The Government later countered this by pointing out that Cpl Lima told NCIS that the party where the incident occurred was in October of 2015. In making arguments for corroboration, the TC admitted, "So I realize that it is very clear to all counsel, as well as the military judge, that there is a date issue with this case. There [are] conflicts with dates. This happened a long time ago."[19] Defense argued that "what has been consistent [from the witnesses] is that it did not happen in 2015, which is the charged period . . . ."[20]

During the contested trial on the merits, the Government presented evidence that the incident occurred at the 2015 pre-deployment party. In opening statements, the TC discussed how the Government knew it happened in 2015. The Defense countered by stating in its opening:

> I've mentioned that they don't know what year it happened.
> There's evidence that's going to come in that said that

---

[14] R. at 59.

[15] *Id*. at 60.

[16] *Id*.

[17] *Id*. at 132.

[18] *Id*. at 133.

[19] *Id*. at 177.

[20] *Id*. at 178.

[Cpl Lima] knew about this incident back in 2014 or early 2015, before the incident was supposed to have taken place, but [Cpl Lima's] going to get up here and tell you that he never learned about it until the end of 2016. How could he have talked about this incident in 2014 or early 2015 if the incident is alleged to have happened on 10 October 2015? It's because it didn't. It doesn't make sense. They don't know what year this occurred, and you're going to see that through the witness testimony that comes out.[21]

The Government's first witness was a former Marine who attended the pre-deployment party and was arrested for driving while intoxicated [DWI] that evening. The Government offered the incident report into evidence to establish the date of the pre-deployment party. The Government also offered Appellant's personnel records showing he deployed one week after the party. When Cpl Lima testified, he identified the pre-deployment party from October 2015 as the date he was sexually assaulted. He also testified that he became intoxicated very quickly by drinking liquor straight from a bottle, which was his last memory of the evening. He awoke the next morning to discover his pants were unbuttoned and unzipped. He testified that this was the only time that something like this had ever occurred. He left the party with his civilian girlfriend, who had slept elsewhere in the home that night. On the drive home, he asked her if anything sexual had happened between them the night before. She said that nothing did.

On cross-examination, Cpl Lima denied ever being told by Appellant in early 2015, or any other time, that Appellant performed oral sex on him. Cpl Lima was challenged with the text messages he exchanged with Appellant during a controlled exchange facilitated by NCIS. Those messages were exchanged in March of 2017, about a year and a half after the party. Appellant said, "I was honest with you whenever I told you that day at my house that I'm the one who sucked you."[22] Cpl Lima never challenged or sought clarification of Appellant's statement. The Government's theory was that Cpl Lima first learned of an oral sex incident with Appellant from a video-call from Appellant's wife while he was deployed to Kuwait in December 2016, over a year after the pre-deployment party. And Cpl Lima maintained that because of his and Appellant's respective deployments, they had not seen each other after the pre-deployment party until after he learned about the

---

[21] *Id.* at 556.

[22] *Id.* at 622; Pros. Ex.4 at 5.

encounter on the video-call. Cpl Lima also denied telling two other Marines about the incident in 2014.

The Government called Cpl Lima's civilian ex-girlfriend. She testified that the day after the pre-deployment party, Cpl Lima asked her if they had engaged in any sexual activity the night before. She confirmed they did not. She also testified that the day after the party, Cpl Lima told her that he believed Appellant "gave him head"[23] while he was passed out. She also testified that, according to Cpl Lima, about a week later he and Appellant discussed what happened and Appellant said the incident was something he "and his friends do in Texas."[24] However, Cpl Lima denied that he ever told his girlfriend anything about confronting Appellant or that Appellant characterized the incident as "something they do down in Texas."[25]

While discussing with counsel the good faith basis for the Defense to inquire into whether Cpl Lima ever used drugs, the military judge stated, "The Defense theory is that the Government's got their year wrong, and that this incident happened in the fall of 2014 . . . ."[26] He also stated, "I mean, the Government's theory is it happened in October. The Defense theory is, no, it didn't; it happened a year earlier. So somebody's right, somebody's wrong, and that's why we have members."[27] Later when discussing an issue under Mil. R. Evid. 412, the military judge stated, "the Defense is not agreeing that there are two incidents. Defense, are you? . . . Am I stating your position correctly?"[28] The TDC replied, "Spot on, Your Honor."[29]

After the civilian wife of one of the witnesses testified that Appellant had admitted to performing oral sex on Cpl Lima, a member asked a question. "When did [Appellant] put [Cpl Lima]'s penis in his mouth, if you know?"[30] The witness answered, "I do not know."[31]

---

[23] R. at 684.

[24] *Id.* at 677-78; 686-87.

[25] *Id.* at 644.

[26] *Id.* at 707.

[27] *Id.*

[28] *Id.* at 716.

[29] *Id.*

[30] *Id.* at 779; App. Ex. XL.

[31] R. at 779.

Another former Marine, the aforementioned Sgt Bravo—who previously testified at an Article 39(a) session—testified for the Defense. He was roommates with Cpl Lima from the summer of 2014 to November of 2015. He testified that he had a conversation with Cpl Lima concerning oral sex with Appellant. And that conversation "took place approximately June of 2015 to November of 2015."[32] But he admitted that in his interview with NCIS in 2017, he said that he believed the conversation happened from 2014 to 2015. The TDC impeached his own witness by reminding him that in his pretrial Article 39(a) testimony, he testified that the conversation happened in the fall of 2014. Sgt Bravo responded that he had been incorrect, because he did not live with Cpl Lima until 2015, and that is when the conversation occurred. The military judge instructed the members that the witness' prior inconsistent statements supporting a 2014 date for the incident were to be used only to evaluate his in-court testimony supporting a 2015 date.[33] We also do not consider the prior inconsistent statements as substantive evidence, but take them into account in considering how much of the Defense trial strategy centered on whether the incident happened in 2014 or 2015.

Finally, Appellant waived his right to not "be a witness against himself"[34] and took the stand. He was adamant the incident occurred at a party at his home in late September or early October in 2014 near the time of a Halloween "rave." He testified that shortly after waking up, Cpl Lima asked him if he had "messed around with anybody at the party that night."[35] Appellant stated that he did not believe so and, at the time, said he could not remember anything happening.

A few days later, according to Appellant, he discussed what happened with Cpl Lima. He admitted to his friend that he thought he performed oral sex on him the night of the party. According to Appellant, Cpl Lima's reaction was to laugh it off and say "at least I got my d[***] wet."[36] Their friendship was unchanged. Cpl Lima, who was living with Appellant and his wife at their on-base home at the time, did not move out until January 2015.

---

[32] *Id.* at 828.

[33] App. Ex. LII at 6.

[34] U.S. Const. amend. V.

[35] R. at 907.

[36] *Id.* at 909.

Appellant also testified about the pre-deployment party. He characterized it as "very planned" and different from the other kinds of parties he and his wife held. He recalled Cpl Lima arriving late, with his girlfriend, whom he was not dating at the time of the 2014 party, and consuming alcohol very quickly. Appellant did not drink very much alcohol because he did not want to risk getting into any trouble or having the police called just as he was about to deploy. The party wound down around 0300 or 0400 and Appellant went to bed. But then he got a phone call from his staff non-commissioned officer. He directed Appellant to come pick up the girlfriend of the Marine who had been arrested for DWI coming from Appellant's party, because that Marine was being placed on restriction [though the reason for this is unclear from the record]. The next morning, Cpl Lima was engaged in conversation with others, and laughing about how drunk he was during the party. He then left with his girlfriend.

About three days later, Appellant deployed to Okinawa for six or seven months. When he returned in the spring of 2016, Cpl Lima was deployed. They stayed in touch and, according to Appellant, never had any discussion about the incident until December of 2016 when Appellant's wife learned of his sexual orientation and various rumors pertaining to that.

The Government presented a case in rebuttal by calling the NCIS special agent who interviewed Appellant. His interview was offered and admitted into evidence. A member asked the special agent, "Can you confirm the exact date that the alleged incident happened?"[37] The special agent gave a somewhat lengthy response, stating that, while both he and Appellant seemed to be discussing a "singular event," he was "not very focused on the date" and that "maybe" he "should have been."[38] He concluded by saying, "the dates involved . . . was not something that I, specifically, drilled down to . . . ."[39]

After the presentation of both side's cases and some discussion about findings instructions, the court recessed at 1655. The parties were set to make closing arguments the next morning. At the time the court recessed, there had been no mention of a variance instruction.

---

[37] *Id*. at 1056; App. Ex. L.

[38] R. at 1056.

[39] *Id*.

### 3. The Government Moves for a Variance

Just after the court recessed, the Government first raised the possibility of a variance instruction to expand the charging window to July 2014. The next morning, at 0814, the Government sent the military judge and the Defense an e-mail[40] requesting a variance instruction to expand the charging window from October 2015 back to July 2014 and some reasons supporting it. At 0852, the court-martial was called to order and the parties discussed the issue.

The TC conceded a variance that extended the charging window back to July 2014 would be material—a concession the Government rejects on appeal because it was based on what it now considers to be an incorrect view of the law—but argued that it would not substantially prejudice Appellant. With respect to prejudice, the TC believed jeopardy had attached, but that Appellant was on notice that a possible date for the offense was in 2014 and had not been misled to the point where he was unable to adequately prepare for trial.

Appellant argued that the Government's corroboration for Appellant's statements were tied to the 2015 date of the offense, that the Government persisted in arguing and attempting to prove the date of the offense was 2015, and that it knew well before preferral of charges of the possible 2014 date for the offense. The Defense argued that such a variance would "pull the rug out from under us . . . ."[41]

The military judge disregarded the TC's concession on the materiality of the variance. Citing to *United States v. Treat*,[42] the military judge found the requested variance was not material because the nature, seriousness, and punishment of the offense would not change. With respect to prejudice, the military judge agreed that jeopardy had attached and was doubtful the Government could charge Appellant again for the same offense if it alleged it happened in 2014. He also found because the Defense knew of the facts that supported the possibility that the incident occurred in 2014, and used those facts as a Defense theory, that Appellant had not been misled so that he was inadequately able to prepare for trial. Soon after this, at 0935, the court-martial was in recess. About an hour later, the parties came back on the

---

[40] App. Ex. LIII.

[41] R. at 1089.

[42] 73 M.J. 331.

record, dealt with some preliminary matters and moved into closing arguments.

During closing, the Government highlighted the variance instruction and read it to the members. The TC argued that because "the accused got up here and he testified, and he said that it occurred—he thought between September and October 2014" that if the members had "any doubt as to the date" that they could write in an extended 2014 date.[43] To the extent the Government referenced dates, it was for the October 2015 date, and its evidence was generally tied to the events of the pre-deployment party. The Defense argument centered on Cpl Lima's lack of credibility, but did argue that the Government's case was weak because it admitted it did not know when the incident took place or at which party it occurred. In rebuttal, the TC, among other arguments, reminded the members they were "able to extend the timeline"[44] if necessary to convict.

*4. After the Members Convict Appellant, the Civilian Defense Counsel Makes Comments on the Record*

The members convicted Appellant of only Specification 1 of the Charge. They excepted the words, "October 2015 and on or about November 2015" and substituted the words "July 2014 and on or about October 2015." The court-martial recessed for the evening after the announcement of findings.

The next day, while the members deliberated on a sentence, the Civilian Defense Counsel made some additional statements for the record regarding the variance. He stated, "If we had known that, we may not have put our client on the stand. Proving that the event happened in 2014 was one of the key factors in making that decision to put him on the stand, convincing the members that it did, in fact, happen in 2014."[45] He added that the variance "changed my closing argument at the last moment"[46] and that the Defense had prepared a case for an allegation that was charged as occurring between on or about October and on or about November of 2015. He continued that the date of the charging "informed and shaped the pretrial litigation of this court-martial as well, as far as discovery, witness requests, motions, the Govern-

---

[43] R. at 1135-36

[44] *Id.* at 1190.

[45] *Id.* at 1292.

[46] *Id.*

ment's position on motions, the judge's rulings regarding particular motions, especially the [corroboration] motion as we've already discussed."[47]

*5. Analysis*

This Court must answer whether the variance was material, and if it was, whether it substantially prejudiced Appellant. Given all of the facts and circumstances of this court-martial and how the sequence of events played out at trial, we easily conclude the variance was fatal; it was material and it substantially prejudiced Appellant.

      a. The variance was material

The variance was material because it substantially changed the nature of the offense. While the offense remained the same—a sexual assault of Cpl Lima at a party at Appellant's house—the nature of the offense was different. In *United States v. Marshall*,[48] a variance was material when the appellant was charged with escaping from the custody of a captain. He defended himself at trial by arguing that he was actually in the custody of a staff sergeant. When the variance allowed for the staff sergeant to be substituted for the captain, this changed the very nature of the offense because it "denied him the opportunity to defend against the charge."[49] Here, there were two different house parties, just as there were two different persons in positions of authority in *Marshall*. The circumstantial context of the different house parties, the witnesses' memories, and the motivations for bias and fabrication are all different.

For example, if the incident happened in 2014, as Appellant testified, it would seem more likely that Cpl Lima felt pressured or shamed to falsely report a sexual assault in 2017, only after Cpl Lima's wife discovered what happened and confronted Appellant. This theory would be buttressed by Cpl Lima's continued friendship with Appellant well over a year after the incident occurred. In fact, during the Government's case in rebuttal one of the members asked the NCIS agent a question that indicates this strategy may have had some traction. He asked, "What's the normal time range for reporting a crime of this nature?"[50] The TC objected to this question, but the mili-

---

[47] *Id.* at 1293.

[48] 67 M.J. 418.

[49] *Id.* at 421 (citing *Teffeau*, 58 M.J. at 67) (internal quotation marks omitted).

[50] App. Ex. XLIX; R. at 1055.

tary judge allowed it. Regardless of whether this would have been a successful strategy or not, the difference between 2014 and 2015 changed the nature of the offense.

### b. The variance was prejudicial

This case differs markedly from a case where a variance was not prejudicial, *United States v. Hopf*.[51] In *Hopf*, the appellant was charged with assaulting a "Han Sum U, a Korean male." But during the trial, the injuries to the victim prevented his appearance and the two witnesses, both American soldiers, did not know the victim's name or who he was. After exceptions and substitutions, the specification read, "an unknown Korean male." There was no disagreement on the underlying facts and context of the assault. Nothing misled the appellant, undermined his defense strategy, or resulted in some kind of surprise at trial.

Similarly, in *United States v. Treat*[52] the variance in a missing movement case was the exception of a specific flight number, "Flight TA4B702" and the substitution of words indicating it was the appellant's "main body" flight for his unit. The time, date, and location of the flight were unchanged. The Court of Appeals for the Armed Forces [CAAF] did not find this to be prejudicial because it did not alter the defense strategy, which was focused on his claim he was kidnapped and unable to be present for his unit's movement. CAAF looked "closely at the specifics of the defense's trial strategy when determining whether a material variance denied an accused the opportunity to defend against a charge" and "how the defense channeled its efforts and what defense counsel focused on or highlighted."[53]

While fifteen months is a considerable amount of time, we note that time alone is not necessarily dispositive in determining whether a variance is fatal.[54] Here we focus on the second and third prongs of the test for whether a

---

[51] 5 C.M.R. 12 (C.M.A. 1952).

[52] 73 M.J. 331.

[53] *Id.* at 336 (citing *Marshall*, 67 M.J. at 421; *Teffeau*, 58 M.J. at 67; *Lovett*, 59 M.J. at 236).

[54] *See*, *e.g.*, *United States v. Parker*, 59 M.J. 195 (C.A.A.F. 2003) (error to instruct on two year variance when prosecution presented no evidence of charged offense during the time-period in the original specification); *United States v. Hunt*, 37 M.J. 344 (C.M.A. 1993) (three weeks difference between time of offense alleged in charge sheet and evidence presented by prosecution fell within "on or about" and variance was not material).

material variance is prejudicial. We find that Appellant was misled "to the extent that he has been unable adequately to prepare for trial" and that he was denied "the opportunity to defend against the charge."[55] Appellant's trial preparation and presentation was effectively a nullity. His theory was that nothing happened in 2015 and that an incident—albeit not a sexual assault—occurred in 2014. This strategy was predicated on the Government's decision to charge the 2015 date.

Moreover, the date discrepancy was well-known to the Government far in advance of trial. While the Government argues that this means Appellant was "on notice" and was able to prepare and benefit from the wording of the specification, all of that preparation and trial strategy was nullified because of the variance. The variance meant not only that Appellant's trial preparation was inadequate for the actual specification the members deliberated on, but that Appellant was effectively retroactively prohibited from presenting a defense. The trial he prepared for was fundamentally different from the charge. The defense he made was virtually irrelevant.

Given that the underlying concern of a variance is one of constitutional due process, it is significant that Appellant waived his right to not be a witness against himself—a fundamental constitutional right embedded in our legal system—to further his trial defense strategy. Rather than aiding his cause, Appellant's testimony had the effect of unfairly supporting the Government's case. There is little possibility Appellant would have testified had the Government charged both the 2014 and the 2015 dates or that Appellant had reason to believe such a variance would be granted.

The overall effect of the variance was to unfairly "pull the rug out" from under Appellant. The Government knew well in advance of the possibility that Appellant would argue that the incident, albeit short of a crime, occurred in 2014 and not in 2015. Yet, it chose to charge the dates it did. Appellant's primary trial strategy, including the decision to testify, centered on the difference between the 2014 date and the charged date. The entire substantive nature of the trial changed for Appellant at the very last minute—after he had already testified—in a way in which he was left unable to adequately defend himself. The variance was fatal.

---

[55] *Treat*, 73 M.J. at 336.

**B. The Evidence is Legally Insufficient**

Having found the variance to be fatal and warranting dismissal of the finding and sentence of the charge and its sole specification, we also find— independent of the variance—that the evidence for the specification is legally insufficient.

*1. Standard of Review*

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[56] When we conduct this de novo review,[57] we are "bound to draw every reasonable inference from the evidence of record in favor of the prosecution."[58]

*2. Analysis*

The only specification Appellant was convicted of has the following elements:

> (1) that he committed a sexual act upon Cpl Lima by placing his mouth around Cpl Lima's penis;

> (2) that he committed the act when Cpl Lima was unaware the sexual act was occurring due to his "exhaustion and intoxication"; and

> (3) that he knew or reasonably should have known Cpl Lima was unaware the sexual act was occurring due to his exhaustion and intoxication.

Given Appellant's testimony, and his admissions to others concerning the sexual act, the central issue is whether Cpl Lima could have been unaware that the sexual act was occurring due to his exhaustion and intoxication.

In considering all of the evidence, we recognize Appellant was acquitted of the same act while Cpl Lima was "asleep" or "incapacitated by intoxication." Though the members found there was not enough evidence for a conviction on

---

[56] *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (citing *United States v. Gutierrez*, 73 M.J. 172, 175 (C.A.A.F. 2014)).

[57] *United States v. Beatty*, 64 M.J. 456, 459 (C.A.A.F. 2007); *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987).

[58] *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citing *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A. 1991)).

these separate specifications, this does not foreclose us from considering evidence pertaining to those specifications in reviewing the specification at issue. For example, in *United States v. Rosario*,[59] CAAF, held that a service court of criminal appeals may consider evidence from a specification for assault, which resulted in an acquittal, when reviewing a specification for an orders violation. An acquittal removes the specification from appellate review, but, depending on the circumstances, does not necessarily remove the underlying evidence from appellate review for other specifications. Therefore, despite an acquittal on the other specifications, this Court can still consider Cpl Lima's level of exhaustion and his intoxication level.

Article 120(b)(2) provides that an accused may be charged with a sexual assault when a victim is "asleep, unconscious, or otherwise unaware the act is occurring." In *United States v. Sager*,[60] CAAF held that each of these three categories constituted a separate theory of liability. In other words, it is unlawful to commit a sexual act on someone who is asleep, just as it is illegal to do so when someone is unconscious, or when someone is "otherwise unaware" in some way that is different from being asleep, and different from being unconscious.[61] In *United States v. Brantley*, one of our sister service courts held that the term "otherwise unaware" takes its context and meaning from the terms "asleep" and "unconscious" in the statute.[62] Likewise, our interpretation[63] has comported with *Brantley*. Thus, "otherwise unaware" is a state separate, but akin to, being asleep or unconscious.

In *United States v. Pease*, this Court[64] attempted to give a detailed definition to the term "incapable of consenting" and was affirmed by CAAF.[65] Where we looked to the statutory language in *Pease* in applying the term "incapable of consenting," we again do the same for the statutory term "otherwise unaware." The statute instructs us on the definition of consent: "a

---

[59] 76 M.J. at 117.

[60] 76 M.J. 158 (C.A.A.F. 2017).

[61] *Id*. at 162.

[62] 2017 CCA LEXIS 742 at *6-7 (A. Ct. Crim. App. Nov. 30, 2017) (unpublished).

[63] *United States v. Washington*, 2019 CCA LEXIS 47 (N-M. Ct. Crim. App. Feb. 8, 2019) (unpublished).

[64] 74 M.J. 763 (N-M. Ct. Crim. App. 2015).

[65] 75 M.J. 180 (C.A.A.F. 2016).

sleeping, unconscious, or incompetent person cannot consent."[66] If a victim is in a physical or mental state where he is "incapable of appraising the nature of the conduct at issue"[67] or "physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act at issue"[68] then he is incapable of consenting. A sleeping or unconscious person cannot possibly give consent to a sexual act because he is physically incapable of giving consent or even manifesting a physical reaction that indicates consent to a reasonable person. An "otherwise unaware" person must also exhibit the same physical or mental traits akin to being asleep or unconscious that would foreclose his ability to understand what is happening or provide physical or verbal signs of consent.

The fatal problem with the specification at issue is that the facts do not support the Government's theory of unawareness. The specification alleges it was a crime for Appellant to commit a sexual act on Cpl Lima when he was unaware the sexual act was occurring because he was "exhausted and intoxicated." However, even viewing the evidence in the light most favorable to the Prosecution, there is insufficient evidence in the record to support a reasonable conclusion that Cpl Lima's unawareness of the sexual act was *caused* by exhaustion and intoxication, and that even if it was, that such unawareness was akin to being asleep or unconscious as required under *Sager*.

Appellant admitted, both in his NCIS interview and in his testimony, that he performed oral sex on Cpl Lima for a couple of minutes, but could not remember if Cpl Lima ejaculated. Appellant testified that he did not look at Cpl Lima's face, and did not know whether his eyes were open or closed. He could not recall what happened immediately before or after the incident, but could not rule out that some other sexual contact occurred. Cpl Lima had no memory of the event whatsoever.

On appeal, the Government argues Cpl Lima was emotionally and physically exhausted due to his heavy drinking that evening and the ordeal of breaking up with his girlfriend that night. It further argues, citing *Sager*, that exhaustion and intoxication are manners of unawareness different from asleep and different from unconsciousness.

---

[66] UCMJ art. 120(g)(7)(B).

[67] UCMJ art. 120(g)(8)(A).

[68] UCMJ art. 120(g)(8)(B).

The Government cites *Brantley*,[69] the aforementioned case from one of our sister service courts, and emphasizes that the specification does not contain the word "otherwise." In *Brantley*, the appellant was charged with committing a sexual act on a victim who was "otherwise unaware." But in *Brantley* there was no context. The specification did not also allege "asleep" or "unconscious," and the military judge's instructions did not define what otherwise unaware meant and in what context. Here, the Government argues that because it specified the means of being unaware—exhaustion and intoxication—that a reasonable factfinder could find that Cpl Lima was unaware.

But while *Brantley* was untethered to anything, this specification was merely tethered to Cpl Lima's "exhaustion and intoxication." The problem is, under these facts, Cpl Lima's exhaustion and intoxication does not even come close to the necessary state akin to, but distinct from, being "asleep" or "unconscious" to sustain a conviction. An unusual fact pattern requires evidence to support it. On the facts of this record, even viewing the evidence in the light most favorable to the Government, we find that no rational trier of fact could have found beyond a reasonable doubt that Cpl Lima was unaware that a sexual act was being committed upon him due to his "exhaustion and intoxication." Therefore, we find Specification 1 of Charge I legally insufficient.[70]

## C. There Was No Conflict of Interest for Detailed Trial Defense Counsel

### 1. Standard of Review and the Law

Whether a conflict of interest exists is a mixed question of law and fact, which we review de novo.[71] The Sixth Amendment affords an accused the right to a conflict-free counsel.[72] An "actual conflict" is one "where a conflict of interest . . . adversely affects counsel's performance."[73] When an appellant

---

[69] 2017 CCA LEXIS 742.

[70] We abstain from reviewing this case for factual sufficiency because we have found it legally insufficient. This is because we are required to "first . . . determine the correct, applicable law in this case in order to properly conduct [our] factual sufficiency analysis." *Pease*, 75 M.J. at 184.

[71] *United States v. Smith*, 44 M.J. 459, 460 (C.A.A.F. 1996).

[72] *United States v. Hale*, 76 M.J. 713, 716 (N-M. Ct. Crim. App. 2017) (citing *Wood v. Georgia*, 450 U.S. 261, 271 (1981)).

[73] *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002).

can show "that a conflict of interest actually affected the adequacy of his representation, [he] need not demonstrate prejudice in order to obtain relief."[74]

### 2. Analysis

After reviewing the sworn declaration of the detailed TDC, we find there was no actual conflict of interest. Appellant's central complaint against his detailed TDC was that he failed to disclose that he had a temporary living arrangement with the VLC in the case and that this conflict caused him to provide bad advice. Specifically, the purported bad advice was that Appellant should enter into a pretrial agreement [PTA] offered by the Convening Authority. Appellant further argues that his TDC's advice on the PTA reflected his desire to not have his active duty service extended for a contested trial.

Based on detailed TDC's affidavit, we find his living arrangement with the VLC had no impact on his advice or the court-martial. The detailed TDC was planning to move his family away from California prior to the end of his active service so his children could begin school. Not wanting to pay for two homes, the detailed TDC rented a room with the VLC, whom he knew and had a professional relationship and personal friendship with, from serving as defense counsel together in the past. The detailed TDC was already detailed to at least one other case with a trial scheduled after Appellant's trial. The detailed TDC's family situation and his end of active service appeared to have no role in his advice to enter into the PTA. Moreover, that advice was echoed by Appellant's other counsel as well.

To be clear, we find no impropriety concerning the friendship between the detailed TDC and the VLC and see nothing that took it into the realm of an inappropriate personal or romantic relationship. The detailed TDC consulted with the supervising Regional Defense Counsel [RDC] concerning the living arrangement with the VLC. The RDC advised him that he was not required to inform his relevant clients about it. We question whether the RDC provided prudent advice by not recommending that TDC disclose to Appellant a living situation that could appear to create a conflict of interest. But there is nothing in the record that indicates there was an actual conflict between TDC's and Appellant's interests. Specifically, there is no evidence that detailed TDC's advice concerning the PTA was tied in any way to his end of active service or that his living situation with the VLC impacted his perfor-

---

[74] *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980) (citation omitted).

mance in any way. Moreover, we find no prejudice due to the potential conflict of interest that arose under these circumstances, and thus, deny any relief due to that potential conflict of interest.[75] Thus, we find this AOE is without merit.

## III. CONCLUSION

The finding and sentence are **SET ASIDE**. The charge and specification are **DISMISSED WITH PREJUDICE**. All rights, privileges, and property of which Appellant has been deprived due to the finding and sentence are ordered restored.[76]

Chief Judge MONAHAN and Judge DEERWESTER concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[75] *See United States v. Strickland*, 466 U.S. 668, 697 (1984) (finding no need to determine whether counsel's performance was deficient if there is an insufficient showing of prejudice).

[76] UCMJ arts. 58b(c), 75(a).